**Willie E. ENOCH, Plaintiff,**

v.

**Richard B. GRAMLEY, Defendant.**

**No. 93–1003.**

United States District Court, C.D. Illinois, Peoria Division.

Aug. 22, 1994.

---

Sheri J. Engelken, Paula M. Taffe, Kirkland & Ellis, Chicago, IL, for plaintiff.

Penelope Gainer, Asst. Atty. Gen., Springfield, IL, for defendant.

### ORDER

McDADE, District Judge.

Before the Court is Willie E. Enoch's ("Petitioner") Petition for a Writ of Habeas Corpus [Doc. # 3] filed pursuant to 28 U.S.C. § 2254. Respondent in his Answer, requests that the Petition be denied and dismissed.[1]

### FACTUAL BACKGROUND [2]

Sometime in the late hours of April 22 or early hours of April 23, 1983, Armanda Kay Burns was brutally murdered. The body of Ms. Burns was found in her basement apartment. Ms. Burns' hands had been bound with a coat hanger behind her back, her jacket and shirt pulled down around her arms, and her clothing below the waist removed. The victim's bra was slightly raised from its normal position. A cloth covered her face. Ms. Burns had been stabbed several times in the face, back and chest, and her throat had been slashed. Ms. Burns' chest and abdominal cavities were laid open by a knife wound which extended from her sternum to her pubic bone. Ms. Burns' brutalized corpse was discovered by her boyfriend, Derek Proctor, and her brother and sister-in-law, Tyrone and Caroline Burns, at approximately 2:15 a.m. on April 23, 1983.

Armanda Burns was, at the time of her murder, twenty-five years old and employed as a supervisor in the housekeeping department of Methodist Medical Center ("Methodist") in Peoria, Illinois. Ms. Burns lived by herself in a basement apartment located approximately one block from Methodist Medical Center. On April 22, 1983, Ms. Burns spent from 12:00 p.m. until 2:40 p.m. with Derek Proctor. Derek Proctor ("Proctor") was Ms. Burns' boyfriend of eight months. During their time together that afternoon, Ms. Burns and Proctor met Caroline and Tyrone Burns and arranged to meet them late that evening at approximately 12:30 a.m. Sometime between 3:00 and 3:15 p.m., Ms. Burns reported for work. Ms. Burns worked

---

1. Also before the Court is Respondent's Motion to Reconsider the Court's Prior Ruling Allowing Petitioner to Supplement the Record [Doc. # 23]. The Court, upon reconsidering its earlier decision allowing expansion of the record, grants Respondent's motion as to the affidavits of Stanley Blackburn, Eugene Cook, James Hense, Shirley Quick, and Cheryl Stevenson. The Court finds that these affidavits by members of the jury which convicted Petitioner are improper and irrelevant. See Gacy v. Welborn, 994 F.2d 305, 313 (7th Cir.1993); Federal Rules of Evidence 606(b).

2. In large measure, the facts presented are those gleaned from the trial record by the Illinois Supreme Court and set out in its opinion on direct appeal. People v. Enoch, 122 Ill.2d 176, 119 Ill.Dec. 265, 522 N.E.2d 1124 (1988). Presumptively, the state court's exposition is correct. 28 U.S.C. § 2254(d); see also Lord v. Duckworth, 29 F.3d 1216, 1223 (7th Cir.1994); Lewis v. Lane, 832 F.2d 1446 (7th Cir.1987); Mills v. Jordan, 979 F.2d 1273 (7th Cir.1992). The facts presented also reflect this Court's extensive review of the record in this case.

the 3:00 p.m. to 11:45 p.m. shift at Methodist Medical Center.

At 11:30 p.m. on the evening of April 22, 1983, Ms. Burns and several members of the Methodist housekeeping staff congregated in her office. Three of these staff members testified at trial that Petitioner entered Ms. Burns' office and inquired as to the whereabouts of his brother who was an employee at Methodist. These witnesses testified that Petitioner and Ms. Burns carried on a conversation. Petitioner was clothed in a blue pin stripe suit and what was described as a "dingy" white shirt. Ms. Burns "punched out" of Methodist at approximately 11:47 p.m. and, accompanied by Petitioner, began walking toward her apartment. Petitioner and Ms. Burns were last seen walking together approximately 100 feet from Ms. Burns' apartment.

Pursuant to the plans Ms. Burns and Proctor had made earlier that day, Proctor arrived at Ms. Burns' apartment sometime between 11:50 p.m. and 12:00 a.m. on the evening and early morning hours of April 22 and 23, 1983. Proctor rang Ms. Burns' doorbell repeatedly, but received no response. Having failed to find Ms. Burns in her apartment, Proctor sat outside the apartment and waited for Ms. Burns to return. Proctor waited in vain for five to ten minutes for Ms. Burns and then walked to Methodist believing that Ms. Burns might still be at work. At approximately 12:10 a.m., Proctor arrived at Methodist and met Winston Ragon, a Methodist security officer. Proctor told Mr. Ragon that he was looking for Ms. Burns and requested that Mr. Ragon telephone the housekeeping office to check if Ms. Burns was still in the office. Mr. Ragon placed the call and informed Proctor that he received no answer. Mr. Ragon testified that Proctor then said that he was just at Ms. Burns' apartment, there was a window broken, he saw a man running from the apartment, and there was no response to his ringing of the doorbell. Mr. Ragon noted that Proctor's clothing was neat in appearance. Proctor concluded his conversation with Mr. Ragon at approximately 12:20 a.m. and walked to the lobby to call Ms. Burns' apartment.

Proctor received no response to his telephone call.

Having failed to reach Ms. Burns by telephone, Proctor returned to her apartment and again rang her doorbell. Again, Proctor received no response. Proctor then walked across the street to Glen Oak Towers, bought a pack of cigarettes, and returned to Ms. Burns' apartment. Proctor again rang the doorbell. He received no response and sat down outside the apartment to wait for Ms. Burns. Proctor testified that at approximately 12:45 a.m. to 12:50 a.m., he heard Ms. Burns' door open. Proctor further testified that he turned and saw a black man dressed in a dark blue, pin-striped suit carrying an off-white shirt in his hands exiting Ms. Burns' apartment. Proctor identified this man as Petitioner. Proctor testified that Petitioner bumped into him on the way out of the apartment and stated in response to Proctor's question concerning Ms. Burns' whereabouts that she was inside the apartment. Proctor rang the doorbell and received no response. Proctor testified that he then turned, ran up the street, and saw Petitioner running across a field and on to Kumpf Street. Proctor testified that he then lost sight of Petitioner.

Proctor returned to Ms. Burns' apartment, rang the doorbell, and knocked on the apartment's windows. Again, Proctor received no response. Proctor testified that he then went across the street to Glen Oak Towers and attempted unsuccessfully to telephone Ms. Burns' mother. Proctor testified that he then returned to Ms. Burns' apartment, again rang the doorbell, and again received no response. Proctor testified that he then went downtown to several bars in search of Petitioner. Proctor failed to locate Petitioner and at approximately 2:00 a.m. went to the home of Tyrone and Caroline Burns. Proctor, accompanied by Tyrone and Caroline Burns, went to Ms. Burns' apartment. Upon arriving at Ms. Burns' apartment, Proctor pushed in a window, peered into the apartment from outside, and made the grisly discovery of Armanda Kay Burns' slain body. The Peoria police were immediately notified and were the first to enter the apartment.

Officer Richard Ledbetter of the Peoria Police Department was the first police officer to arrive at the scene of the murder. Officer Ledbetter met Proctor outside Ms. Burns' apartment. Officer Ledbetter testified that Proctor's appearance was neat and that he was crying. As additional members of the Peoria police department arrived, the investigation of the murder of Ms. Burns began. The police recovered near the crime scene a white shirt which appeared to have blood on it. In addition, a kitchen type knife with a brown wooden handle was discovered in the field across which Proctor stated that Petitioner had fled. Police observed blood in the entrance way, living room, and bedroom areas of Ms. Burns' apartment. No blood was observed in the kitchen area.

Acting upon information provided by Proctor and members of Petitioner's family, Officers Hoskins and Cannon of the Peoria Police Department began searching for Petitioner at the home of his girlfriend, Louise Pate ("Pate"). The officers found Petitioner at Pate's home, placed him under arrest, and took him to the Peoria Police Department. At the police department, Petitioner stated that on the night of Ms. Burns' murder, he had seen and spoken to her at Methodist, walked with her to within one block of her home, and given her some cocaine in a matchbook cover. In response to the officers' statement that Ms. Burns was a victim of murder, Petitioner stated "No, not Kay Burns, Kay Burns."

At the time of Ms. Burns' murder, Petitioner was living with Louise Pate. Pate testified that on April 22, 1983, Petitioner left her home at approximately noon dressed in blue, baggy pants, a vest, a blue, pin-striped suit coat, a white shirt, and black shoes. Pate further testified that Petitioner returned to her home at some time in the early morning hours of April 23, 1983. Pate testified that upon his return, Petitioner went into the bathroom and ran the water. Petitioner, according to Pate's testimony, then stated that he wanted a cigarette and that he was going to go to his sister's nearby apartment to get one. Pate testified that Petitioner returned to her apartment after a couple of minutes at which time she turned on a light and discovered that Petitioner was wearing her pants. Pate testified that Petitioner then told her that he had just killed Kay Burns and that he had cut her throat and heart out. Petitioner stated to Pate that he had gone to the hospital, met Ms. Burns, pretended that he had cocaine, went with Ms. Burns to her house, took his coat off, and cut Ms. Burns' throat while she was in the kitchen. Pate testified that Petitioner stated that Ms. Burns' boyfriend had seen him leaving the apartment and that he had killed Ms. Burns because she was trying to get his brother fired from his job at Methodist and because of cocaine and a gang named the Disciples. Petitioner then told Pate that he had burned his blue baggy pants in the incinerator.

Pate testified that she never again saw the white shirt Petitioner was wearing when he left her apartment on April 22, 1983. In addition, Pate testified that Petitioner regularly carried with him a steak knife owned by Pate which had a wooden, black/brown handle and a smooth blade. Pate testified that she had not seen her knife since April 22, 1983. Pate also testified that the knife discovered in the field close to Ms. Burns' apartment looked similar to her knife except that the handle on her knife was darker, her knife was sharp, and a piece was not missing from her knife's handle.

On cross-examination, Pate stated that prior to her statements to police, she was told by the police that if she were to lie to the police, she could go to jail. Pate believed that if she were to go to jail, her child would be taken from her. Pate stated that she went to the home of Octavia Burchett and told her that her testimony before the grand jury in this case was untrue. Pate wanted to know what would be the consequences of changing her grand jury testimony. Pate's testimony before the grand jury was substantially the same as her testimony at trial.

On redirect, Pate testified that she considered changing her testimony because she did not want to testify against Petitioner and, possibly, be responsible for his being executed. Pate testified that it was Petitioner's idea that she contact Ms. Burchett, a woman who Petitioner said knew the law, and tell

her that Pate's grand jury testimony was a lie. Pate testified that she did not lie to the grand jury or in her testimony at trial and that she was not threatened with arrest if she did not testify in a certain way. Instead, Pate testified that she lied when she told Ms. Burchett that she had lied to the grand jury.

Petitioner was charged with attempt rape, aggravated kidnapping, armed robbery, and felony murder based upon armed robbery and murder. At trial, the above evidence was put forth as well as scientific and past crimes evidence. Diane Schneider, a forensic scientist for the Illinois Department of Law Enforcement, testified that hair fragments taken from the head of Petitioner were compared to hair fragments found on the body of Ms. Burns. Ms. Schneider testified that the hair fragments were consistent. However, Ms. Schneider testified that she could not state definitively that the hair taken from the body of Ms. Burns was from Petitioner. Ms. Schneider also testified that she examined a pair of shoes and a ring taken from Petitioner. Although these items tested positive for the possible presence of human blood, the amounts were too small to type or otherwise identify. Indeed, Ms. Schneider testified that the test she conducted only indicated that blood might be present on the items. Ms. Schneider also testified that the blood on the shirt discovered outside Ms. Burns' apartment was of the same type as both Petitioner and Ms. Burns.

Also adduced at trial was the testimony of Louella Burnside and Marilyn McClain. Ms. Burnside testified that in the early morning hours of March 6, 1983, she was attacked by Petitioner. Ms. Burnside testified that she was walking down the street in front of her house when Petitioner approached her and asked if he could walk with her. She did not know Petitioner, but Petitioner stated that his name was Willie. Petitioner stabbed her in the lower back, forced her into a garage, ordered her to disrobe, and told her that he would cut her throat if she did not do as he ordered. Petitioner raped her and tore up her jacket. Petitioner tied her hands behind her back with pieces of her torn jacket, gagged her, and threatened her with death if she reported the incident to the police.

Ms. McClain testified that on the evening of March 30, 1983, she was attacked by Petitioner. Ms. McClain testified that she was at home that evening when Petitioner knocked on her door and asked if she knew where his brother lived. She told Petitioner that she did not know his brother. Petitioner asked for a glass of water. Ms. McClain got Petitioner a glass of water, returned the glass to the kitchen, and then returned to the living room. Petitioner entered the house and locked the door behind him. Petitioner brandished a knife and stated that he would kill her if she said anything. Petitioner tore up a towel, tied her hands behind her back, and gagged her with the towel fragments. Petitioner asked her if she was "in [her] period" and repeatedly stated "shut up, bitch, I will kill you." While Petitioner was attempting to locate Ms. McClain's purse, she freed her hands and ran toward the front door of her apartment. Petitioner fought with Ms. McClain as she attempted to flee, but fled when she screamed for her neighbor. Ms. McClain later discovered that Petitioner had cut her in the stomach area with his knife.

Petitioner was convicted by a jury of attempt rape, aggravated kidnapping, and murder, but was found not guilty of armed robbery and felony murder. Petitioner waived jury consideration of sentencing issues and elected instead to have the court decide the issues. In the first phase of sentencing, the court found beyond a reasonable doubt that Petitioner was eligible for the imposition of the death penalty. In the second phase of sentencing, the court heard testimony that Petitioner had been previously been convicted of the rape and armed robbery of four women. The court also heard evidence from Adelean Byrd, Petitioner's mother, and Louise Pate in mitigation of Petitioner's prior criminal behavior. The court found that the murder was exceptionally brutal and heinous and indicative of wanton cruelty, that the murder was premeditated, that Petitioner would be a clear and present danger as an inmate, and that no mitigating circumstances existed. The court sentenced Petitioner to death.

## PROCEDURAL POSTURE

On November 22, 1983, Petitioner was convicted by a jury of murder, aggravated kidnapping, and attempt rape in the Circuit Court of the Tenth Judicial Circuit in Peoria, Illinois. Petitioner was sentenced to death for his crimes. Petitioner's conviction was, by operation of Illinois law, appealed directly to the Supreme Court of Illinois. Petitioner raised seventeen grounds on direct appeal.[3] The Supreme Court of Illinois affirmed both Petitioner's conviction and Petitioner's sentence of death. *People v. Enoch,* 122 Ill.2d 176, 119 Ill.Dec. 265, 522 N.E.2d 1124 (1988).

In affirming Petitioner's conviction and sentence, the Illinois Supreme Court stated that because Petitioner had failed to comply with the statutory requirement of filing a post-trial motion, the court's review would be limited to constitutional issues which had been properly raised at trial and which could be raised later in a post-conviction hearing petition, sufficiency of evidence, and plain error. Accordingly, the Illinois Supreme Court addressed only Petitioner's grounds which claimed that: 1) admission of custodial statements made by Petitioner violated his Miranda rights; 2) there was insufficient evidence to sustain a conviction for aggravated kidnapping; 3) there was insufficient evidence to sustain a conviction for attempt rape; 4) the trial court erred when it failed to *sua sponte* instruct the jury on the lesser included offense of unlawful restraint; 5) Rose's failure to file a post-trial motion and his failure to preserve trial error for review constituted ineffective assistance of counsel; 6) the Illinois death penalty is unconstitution-al because it limits the death penalty to classes of defendants who do not require special assistance for trial; and 7) the Illinois death penalty is unconstitutional because it does not require the prosecution to prove beyond a reasonable doubt that the death penalty is appropriate, it does not provide adequate safeguards, and it fails to ensure adequate appellate review. The Illinois Supreme Court held that the remaining grounds were waived. The Illinois Supreme Court then addressed Petitioner's grounds which were properly before it and found them to be without merit. The Supreme Court of the United States denied Petitioner's subsequently filed writ of *certiorari. Enoch v. Illinois,* 488 U.S. 917, 109 S.Ct. 274, 102 L.Ed.2d 263 (1988).

In April of 1989, Petitioner filed a *pro se* petition for post-conviction relief with the state circuit court. Subsequently, the law firm of Kirkland & Ellis was appointed to represent Petitioner and, in March of 1990, an amended petition for post-conviction relief was filed on behalf of Petitioner. Petitioner's amended petition raised four grounds for relief. First, Petitioner argued that his trial counsel, Mark Rose, suffered a *per se* conflict of interest which rendered him ineffective, and the trial court failed to conduct an adequate hearing regarding the conflict. Second, Petitioner argued that his trial counsel, Mark Rose, was actually ineffective as a result of trial counsel's failure to investigate, to develop Petitioner's defense theory, to call witnesses, to properly cross-examine Proctor, and to preserve objections and errors for

---

**3.** The grounds raised by Petitioner were: 1) the admission of custodial statements made by Petitioner violated his Miranda rights; 2) insufficient evidence to sustain a conviction for aggravated kidnapping; 3) use of an invalid aggravating factor, aggravated kidnapping, to find Petitioner death eligible; 4) improper conviction for aggravated kidnapping because it is a lesser included offense in attempted rape; 5) failure to instruct the jury on lesser included offense of unlawful restraint; 6) insufficient evidence to convict for attempted rape; 7) admission of prior crime evidence; 8) improper opening argument by the prosecution; 9) refusal to instruct the jury regarding circumstantial evidence; 10) denial of a fair trial because a police officer sat at the prosecution's table; 11) violation of due process because sentencing court relied upon a finding that petitioner was "a clear and present danger" when imposing the death penalty; 12) Petitioner did not knowingly and intelligently waive his right to be sentenced by a jury; 13) the Illinois death penalty is unconstitutional because it limits the death penalty to classes of defendants that do not require special assistance at trial; 14) the Illinois death penalty is unconstitutional because it fails to require the prosecution to prove beyond a reasonable doubt that the death penalty is appropriate, it does not ensure adequate safeguards, and fails to ensure adequate appellate review; 15) trial counsel's failure to file a post-trial motion and failure to preserve trial error for review constituted ineffective assistance of counsel; 16) the trial court erred in refusing to disqualify an alternate juror; and 17) juror Rosenboehm was biased.

appeal, and that appellate counsel Seeder was ineffective for failing to raise the issue of Rose's conflict of interest. Third, Petitioner argued that the retroactive application by the Supreme Court of Illinois of Ill.Rev.Stat., ch. 38, ¶ 116–1 denied Petitioner his constitutional right of appeal. Fourth, Petitioner argued that the Illinois death penalty statute is unconstitutional because it precludes consideration of mercy by the sentencer and, therefore, does not allow the sentencer to make an individualized choice as to whether to impose the death penalty and operates so as to divest the sentencer of discretion. The circuit court dismissed Petitioner's petition.

The Supreme Court of Illinois affirmed the decision of the circuit court and dismissed Petitioner's petition for post-conviction relief. *People v. Enoch,* 146 Ill.2d 44, 165 Ill.Dec. 719, 585 N.E.2d 115 (1992). In so doing, the Supreme Court of Illinois addressed the merits of Petitioner's grounds claiming ineffective assistance of counsel and improper retroactive application of the statute requiring the filing of a post-trial motion. The Supreme Court of Illinois held, however, that Petitioner had waived his claim that the Illinois death penalty unconstitutionally deprives a sentencer of discretion because Petitioner could have, but did not, raise the claim on direct appeal. Petitioner now seeks habeas relief in this Court.

In his habeas petition, Petitioner raises fifteen grounds for relief. They are: (1) Petitioner's rights under the Fifth and Fourteenth Amendments were violated by the admission at trial of his custodial statements; (2) Petitioner is actually innocent of the crimes of which he was convicted; (3) evidence of dissimilar crimes was incorrectly admitted at trial; (4) Petitioner was denied a fair trial by the prosecutor's opening remarks; (5) Petitioner's trial counsel suffered from a conflict of interest which rendered him ineffective; (6) the trial court failed to conduct an adequate hearing as to the conflict of interest of Petitioner's counsel; (7) Petitioner's trial counsel was ineffective under the *Strickland* standard because trial counsel's preparation and presentation of Petitioner's defense was deficient; (8) Petitioner was improperly convicted of aggravated kidnapping; (9) Petitioner was improperly convicted of attempt rape; (10) Petitioner was denied a fair trial because the trial court refused to give a circumstantial evidence instruction; (11) Petitioner's death sentence was improperly based upon the trial court's finding that Petitioner was a "clear and present danger" in prison; (12) Petitioner did not knowingly and intelligently waive his right to be sentenced by a jury; (13) the Illinois Supreme Court's retroactive application of a new waiver rule denied Petitioner a fair trial; (14) the Illinois death penalty statute is unconstitutional because it prohibits an individualized determination that death is an appropriate sentence in a particular case; and (15) Petitioner is actually innocent of the death penalty. Since Respondent argues that Petitioner has waived many of his claims due to procedural default, the Court shall first address these arguments and determine which, if any, grounds have been procedurally defaulted by Petitioner.

### PROCEDURAL DEFAULT

Procedurally defaulted claims in which a petitioner failed to follow an applicable state procedural rule in raising the claims may not be reached on the merits by a court unless cause and prejudice or miscarriage of justice are shown. *Sawyer v. Whitley,* —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In *Coleman v. Thompson,* the Supreme Court discussed procedural default in the context of federal habeas corpus review and stated:

> We now make it explicit: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

Illinois treats any claim which could have been presented to a reviewing court on direct appeal as barred under the doctrine of waiver. *Reese v. Peters,* 926 F.2d 668, 671 (7th Cir.1991); *People v. Silagy,* 116 Ill.2d 357, 107 Ill.Dec. 677, 680, 507 N.E.2d 830, 833 (1987); *People v. Burns,* 75 Ill.2d 282, 26 Ill.Dec. 679, 682, 388 N.E.2d 394, 397 (1979). In addition, Illinois treats claims of substantial denial of constitutional rights as waived if they are not raised in the original or amended post conviction petition. *Reese,* 926 F.2d at 671; Ill.Rev.Stat. 725 ILCS 5/122-3. Finally, Illinois treats the failure to raise an issue in a written motion for a new trial as constituting a waiver of that issue. Ill.Rev. Stat. 725 ILCS 5/116-1; *People v. Shum,* 117 Ill.2d 317, 111 Ill.Dec. 546, 553, 512 N.E.2d 1183, 1190 (1987); *People v. Szabo,* 113 Ill.2d 83, 100 Ill.Dec. 726, 730, 497 N.E.2d 995, 999 (1986); *People v. Porter,* 111 Ill.2d 386, 95 Ill.Dec. 465, 470, 489 N.E.2d 1329, 1334 (1986); *People v. Caballero,* 102 Ill.2d 23, 79 Ill.Dec. 625, 629, 464 N.E.2d 223, 227 (1984); *People v. Pickett,* 54 Ill.2d 280, 282, 296 N.E.2d 856 (1973). With these rules and principles in mind, the Court shall address Respondent's procedural default arguments *seriatim.*

*GROUND TWO*

Ground Two of the Petition claims that Petitioner is actually innocent of the crimes of which he was convicted. Subsequent to Petitioner's filing of his Petition, however, the Supreme Court decided the case of *Herrera v. Collins,* —— U.S. ——, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), which, seemingly[4], held that a claim of actual innocence is not a free standing constitutional claim upon which habeas relief can be granted. Petitioner, in his Memorandum in Support of Petition filed after the Supreme Court's decision in *Herrera,* appears to concede that actual innocence is not a free standing claim cognizable in federal habeas review and has apparently abandoned his claim made in Ground Two. Petitioner now contends instead that his claim of actual innocence serves as a gateway

through which the federal courts may review his procedurally defaulted claims. Petitioner does, however, refer to the possibility that the Supreme Court may, in the context of a death penalty case, recognize a free standing constitutional claim of actual innocence. As such, the Court shall analyze Petitioner's argument of actual innocence made in Ground Two in the context of a free standing constitutional claim. Petitioner's argument of actual innocence as an exception to the rule barring federal habeas review of procedurally defaulted claims shall be addressed *infra* in the portion of this Order discussing the miscarriage of justice exception.

Respondent argues that Petitioner has procedurally defaulted his claim made in Ground Two or, in the alternative, the claim is without merit. Despite first citing *Herrera,* a case in which the Supreme Court explicitly differentiates the claims of insufficiency of the evidence and actual innocence, Respondent continues on to cite *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and appears to analyze the claim as one alleging insufficiency of the evidence.[5] —— U.S. at ——, 113 S.Ct. at 861. Respondent's analytical approach is, quite clearly, incorrect. An insufficiency of the evidence claim argues legal innocence where as an actual innocence claim argues factual innocence. *Sawyer,* —— U.S. at ——, 112 S.Ct. at 2519 *citing Smith v. Murray,* 477 U.S. 527, 537, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986).

At first glance, the Supreme Court in *Herrera* appears to have held that the claim of actual innocence is not a free standing constitutional claim. Thus, under existing Supreme Court precedent, a free standing claim of actual innocence does not exist. The Court notes, however, that a majority on the Supreme Court appears to be willing to hold that it would be unconstitutional to execute an innocent person. *Herrera,* —— U.S. at ——, ——, 113 S.Ct. at 869, 870 (O'Connor concurring, joined by Kennedy), —— U.S. at ——, 113 S.Ct. at 875 (White concur-

---

**4.** See Justice Scalia's concurring opinion. —— U.S. at ——, 113 S.Ct. at 874 (*joined by* Justice Thomas).

**5.** Indeed, Respondent entitles its response to Petitioner's second ground as "Sufficiency of the Evidence Claim."

ring), —— U.S. at ——, 113 S.Ct. at 876 (Blackmun dissenting, joined in relevant part by Stevens and Souter), *But See* —— U.S. at ——, 113 S.Ct. at 874 (Scalia concurring joined by Thomas); *Milone v. Camp,* 22 F.3d 693, 700 (7th Cir.1994). Indeed, Chief Justice Rehnquist, the author of *Herrera,* assumed for the sake of argument that "a truly persuasive demonstration of 'actual innocence' made after trial" would make the execution of a defendant unconstitutional. *Herrera,* —— U.S. at ——, 113 S.Ct. at 869. Accordingly, the Court shall assume *arguendo* for the sake of deciding this case that a free standing claim of actual innocence in the context of a case in which the death penalty has been imposed is cognizable under federal habeas review.[6]

 Petitioner's claim of actual innocence fails for at least two reasons. First, Petitioner did not present this claim to the state courts of Illinois and, therefore, the claim has been procedurally defaulted. *Reese,* 926 F.2d at 671. Second, if Petitioner's actual innocence claim was considered to be apparent from his state court petitions or were found to be excusable under one of the exceptions to the rule barring federal habeas review of procedurally defaulted claims, our Supreme Court stated that a petitioner's threshold evidentiary showing for this assumed constitutional claim would be "extraordinarily high." *Herrera,* —— U.S. at ——, 113 S.Ct. at 869. The Court finds that the evidentiary showing made by Petitioner falls far short of meeting this assumed claim's extraordinarily high threshold.

The Supreme Court in *Herrera* did not set forth the precise burden of proof applicable in an actual innocence claim. The Court finds, however, that to be entitled to relief based upon actual newly discovered or newly presented evidence and the record as a whole, he is probably innocent.[7] Although the Court feels that the burden of proof should be higher, the use of this relatively minimal standard comports with a majority of those justices who appear willing to recognize this assumed claim. *Herrera,* —— U.S. at ——, 113 S.Ct. at 882. As such, the Court deems this the appropriate standard to be used until that time when the Supreme Court explicitly recognizes a claim of actual innocence and explicitly sets forth its accompanying burden of proof.

In support of his claim of actual innocence, Petitioner first re-argues the evidence presented at trial. Next, Petitioner offers the affidavits of four persons. Affiant Linda Thorpe states that at between 11:45 p.m. and 12:00 a.m. on the night of Ms. Burns' murder she saw Ms. Burns outside of her apartment with a man who was much taller than she. Affiant Terrie Meeks (Burwell) states that at approximately 3:30 a.m. on April 23, 1983 she heard a woman scream "Oh my God, Help me." Ms. Meeks states that she actually may have heard the scream an "hour or so earlier." Affiant Steven Fehr states that he was Ms. Meeks supervisor on April 23, 1983 and that at some time between 1:30 and 3:00 she telephoned him to report a woman's screams. Affiant Greg Hunter states that although he testified at Petitioner's trial, he states again that Petitioner was wearing a blue pin-striped suit with matching coat and pants. Finally, Petitioner offers new evidence uncovered by Petitioner's court appointed investigator. This evidence consists of Ms. Burns' time card which shows that she left Methodist sometime between 11:47 and 11:48 p.m. on April 22, 1983, and that the casual walking time between the time clock and Ms. Burns' apartment is approximately four and one half minutes.

---

**6.** As previously noted, Petitioner appears to have abandoned this claim.

**7.** *See Herrera,* —— U.S. at ——, 113 U.S. at 869 (Rehnquist, suggesting that the evidentiary standard would be extraordinarily high), 874 (O'Connor joined by Kennedy, federal habeas relief must be reserved for extraordinarily high and truly persuasive demonstrations of actual innocence), 875 (White, a petitioner would be required, at the very least, to show that no rational trier of fact could find guilt beyond a reasonable doubt), 882 (Blackmun joined by Stevens and Souter, the standard must be higher than the threshold standard for merely reaching a procedurally defaulted or abusive claim (a fair probability that in light of all the evidence the trier of fact would have entertained a reasonable doubt of his guilt), for relief to be granted, a petitioner would be required to show that in light of all the evidence he is probably innocent).

Upon reviewing the evidence presented by Petitioner as well as the record as a whole, the Court finds that Petitioner has failed to show that in light of all the evidence, he is probably innocent. In so stating, the Court first notes that it is not a forum "in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391, 77 L.Ed.2d 1090 (1983). In addition, the Court finds that Petitioner's theory of the case is unpersuasive. Petitioner's primary argument concerning his innocence appears to be that Proctor, not Petitioner, murdered Ms. Burns. Petitioner theorizes that Proctor murdered Ms. Burns between the time she arrived home from work, approximately 11:52 p.m., and the time that Proctor appeared at Methodist and spoke to Ragon, approximately 12:10 a.m. The Court finds it unbelievable that in this eighteen minute period, Proctor could attack and subdue Ms. Burns, bind her hands and disrobe her, stab her savagely and repeatedly, remove from himself and his clothing any indication of the vicious attack, compose himself so as to appear lucid and calm, formulate a plan whereby he would go to Methodist and concoct a story that would implicate Petitioner, a person with whom Proctor was at best vaguely familiar, as Ms. Burns' murderer, and then make the walk to Methodist. Common sense simply makes such a theory untenable. Finally, the evidence offered by Petitioner does little to rebut the substantial case presented by the prosecution. The time card and walking time evidence attempts to make fine temporal distinctions in a case characterized by coarse estimations of the relevant time periods. Hunter had already testified at Petitioner's trial that Petitioner was wearing a blue pin-striped suit on April 22, 1983. Meeks' and Fehr's testimony does little if anything to establish either the identity of the woman whose scream was heard or the timing of that scream. Indeed, the timing of the scream strongly indicates that it was not Ms. Burns who Meeks heard that morning. As for Thorpe's testimony, although probative, it is by no means determinative of Petitioner's guilt or innocence. The Court finds that Petitioner, in light of the substantial showing of his guilt in the record, has failed to show that based upon the record and newly discovered or presented evidence he is probably innocent. In addition, Petitioner's showing does not rise to a level precluding any rational trier of fact from finding guilt beyond a reasonable doubt nor can it be characterized as being extraordinarily high and truly persuasive of Petitioner's innocence. Accordingly, the Court finds that, even if a free standing constitutional claim of actual innocence existed in the present context, the claim would be both procedurally defaulted and without merit. Therefore, the Court finds that Petitioner's Ground Two is without merit and is not a proper basis upon which to grant habeas relief in this case.

### GROUND THREE

■ Ground Three of the Petition claims that evidence of dissimilar crimes was erroneously admitted, denying Petitioner a fundamentally fair trial. Respondent argues that the Supreme Court of Illinois in *Enoch*, 522 N.E.2d at 1129–32, found this claim to be waived for failure to file a post-trial motion as required by Ill.Rev.Stat. 725 ILCS 5/116–1, and as such, the claim has been procedurally defaulted. Petitioner does not attempt to refute Respondent's argument. The Court finds that Petitioner has procedurally defaulted this claim.[8] *Coleman*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

### GROUND FOUR

■ Ground Four of the Petition claims that the prosecutor's opening statement was

---

8. Although Petitioner does not argue in the context of procedural default analysis that Ill.Rev. Stat. 725 ILCS 5/116–1, (formerly ch. 38, ¶ 116–1) was not an established waiver rule at the time Petitioner's case concluded, the Court has considered the matter and finds that the waiver rule set out in 725 ILCS 5/116–1, was not novel as applied to Petitioner, was well established and regularly followed, and may properly serve as a basis for finding procedural default. See pages 69–74 *infra* for the Court's discussion concerning the novelty of 725 ILCS 5/116–1, as applied to Petitioner. The Court notes that even if it were found that Petitioner had not procedurally defaulted the claims made in Grounds Three, Four, Ten, Eleven, and Twelve pursuant to 725 ILCS 5/116–1, Petitioner's claims are without merit and would not be a basis upon which to grant habeas relief. See pages 63–65 *infra* for the Court's discussion of the merits of Grounds Three, Four, Ten, Eleven, and Twelve.

improper and prejudiced Petitioner so severely that he was denied a fair trial. Respondent argues that the Supreme Court of Illinois in *Enoch*, 522 N.E.2d at 1129–32, found this claim to be waived for failure to file a post-trial motion as required by Ill.Rev. Stat. 725 ILCS 5/116–1, and as such, the claim has been procedurally defaulted. Petitioner does not attempt to refute Respondent's argument. The Court finds that Petitioner has procedurally defaulted this claim. *Coleman*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

## GROUND TEN

▇ Ground Ten of the Petition claims that the trial court's refusal to give a circumstantial evidence instruction denied Petitioner a fair trial. Respondent argues that the Supreme Court of Illinois in *Enoch*, 522 N.E.2d at 1129–32, found this claim to be waived for failure to file a post-trial motion as required by Ill.Rev.Stat. 725 ILCS 5/116–1, and as such, the claim has been procedurally defaulted. Petitioner does not attempt to refute Respondent's argument. The Court finds that Petitioner has procedurally defaulted this claim. *Coleman*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

## GROUND ELEVEN

▇ Ground Eleven of the Petition claims that Petitioner's death sentence was improperly based upon the trial judge's finding that Petitioner was a "clear and present" danger in prison. Respondent argues that the Supreme Court of Illinois in *Enoch*, 522 N.E.2d at 1129–32, found this claim to be waived for failure to file a post-trial motion as required by Ill.Rev.Stat. 725 ILCS 5/116–1, and as such, the claim has been procedurally defaulted. Petitioner has not attempted to refute Respondent's argument. The Court finds that Petitioner has procedurally defaulted this claim. *Coleman*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

## GROUND TWELVE

▇ Ground Twelve of the Petition claims that Petitioner did not knowingly and intelligently waive his right to a jury sentencing. Respondent argues that the Supreme Court of Illinois in *Enoch*, 522 N.E.2d at 1129–32, found this claim to be waived for failure to file a post-trial motion as required by Ill.Rev.Stat. 725 ILCS 5/116–1, and as such, the claim has been procedurally defaulted. Petitioner does not attempt to refute Respondent's argument. The Court finds that Petitioner has procedurally defaulted this claim. *Coleman*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

## GROUND FOURTEEN

▇ Ground Fourteen of the Petition claims that the Illinois death penalty statute is unconstitutional because it prohibits an individualized determination that death is the appropriate sentence in each case. Respondent argues that the Supreme Court of Illinois in *Enoch*, 585 N.E.2d at 122–23, found that this claim was waived because Petitioner failed to raise on direct appeal this specific claim and as such, the claim has been procedurally defaulted. Petitioner has not attempted to refute Respondent's argument. The Court finds that Petitioner has procedurally defaulted this claim. *Coleman*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

## CAUSE/PREJUDICE AND MISCARRIAGE OF JUSTICE

▇ Although a petitioner may have procedurally defaulted a federal claim, the claim may still be reviewed via a federal habeas petition if the petitioner can demonstrate cause for the default and actual prejudice, or demonstrate that failure to consider the claim would result in a fundamental miscarriage of justice. *Herrera*, —— U.S. at —— – ——, 113 S.Ct. at 862–63 (1993); *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565; *Madyun v. Young*, 852 F.2d 1029, 1032 (7th Cir.1988). "Cause" and "prejudice" in the context of procedural default require a showing of some objective factor external to the defense which prevented Petitioner or his counsel from complying with a state's procedural rule and a showing of actual prejudice resulting from the errors of which a petitioner complains, respectively. *Murray v. Carrier*, 477 U.S. at 492, 106 S.Ct. at 2647;

*McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). "Fundamental miscarriage of justice" has been described as having a narrow scope and is concerned with and equivalent to actual innocence. *Sawyer,* —— U.S. at ——–——, 112 S.Ct. at 2518–19 (1992).

■ Petitioner does not allege that any external impediment existed to his complying with the state's procedural rule nor does he even argue the existence of cause for his procedurally defaulting the above claims or that he was prejudiced by his inability to raise the defaulted claims.[9] Rather, Petitioner argues, at least in his Memorandum in Support of his Petition, that his defaulted claims should be addressed on their merits because he is actually innocent and, as such, the fundamental miscarriage of justice exception applies to his case. Petitioner contends that his claim of actual innocence is a gateway affording habeas review of his procedurally defaulted constitutional claims asserted in his petition. Therefore, the Court shall examine Petitioner's assertion of actual innocence in the context of the miscarriage of justice exception to the bar against federal habeas review of procedurally defaulted claims.

In analyzing Petitioner's contention that the fundamental miscarriage of justice or actual innocence exception to the bar against federal review of procedurally defaulted claims applies in this case, the Court must first determine what standard should be applied to such a claim. In a trio of cases decided in 1986, the Supreme Court defined the actual innocence exception. In *Kuhlmann v. Wilson,* the Supreme Court held that a federal court could reach the merits of a successive petition if the petitioner "supplements his constitutional claim with a colorable showing of factual innocence." 477 U.S. 436, 454, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986) (plurality). The Supreme Court went on to state that "[t]he prisoner may make the requisite showing by establishing that under the probative evidence he has a colorable claim of factual innocence," and that review of successive petitions should be granted "only in rare cases." *Id.*

In *Murray v. Carrier,* the Supreme Court addressed the actual innocence exception in the context of procedurally defaulted claims. 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The Supreme Court stated that "in the extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ." 477 U.S. at 496, 106 S.Ct. at 2649. In *Smith v. Murray,* the third of the Supreme Court's 1986 trilogy of actual innocence exception cases, the Supreme Court quoted and applied the standard annunciated by *Carrier* in the context of a capital sentencing case. 477 U.S. 527, 537, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986).[10] These cases established that the standard for applying the actual innocence exception to procedurally barred claims was that a petitioner must establish, in light of all the evidence, that a constitutional violation had probably resulted in the conviction of one who is actually innocent.[11]

---

**9.** Even if the Court were to construe Petitioner's claims of ineffective assistance of counsel in relation to Petitioner's trial counsel's failure to file a post-trial motion as an argument to establish cause for his procedural default, the Court finds that cause is lacking. Ineffective assistance is cause for a procedural default. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). However, in the present case, the Court has found that Petitioner's trial counsel was not ineffective under the *Strickland v. Washington* standard for failing to file a post-trial motion. *See infra* pages 744–745. As the Supreme Court stated in *Murray,* "[s]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra,* we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default. 477 U.S. at 488, 106 S.Ct. at 2645. Accordingly, trial counsel's failure to file a post-trial motion does not constitute cause for Petitioner's procedural defaults.

**10.** Both *Kuhlmann* and *Carrier* involved a petitioner's attack upon the validity of his conviction in a non-capital sentencing context. *Smith* involved a petitioner's attack upon the validity of his death sentence.

**11.** *McCleskey v. Zant* held that the standard for analyzing state procedural defaults and abuse of writ should be the same when considering the actual innocence exception. 499 U.S. 467, 493, 111 S.Ct. 1454, 1469, 113 L.Ed.2d 517 (1991).

In 1992, the Supreme Court altered the contours of actual innocence exception jurisprudence with its decision in *Sawyer v. Whitley.* ——— U.S. ———, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). The issue before the Supreme Court in *Sawyer* was the proper standard for determining whether a petitioner pursuing a successive, abusive, or procedurally defaulted federal habeas claim had demonstrated that he was actually innocent of the death penalty to which he had been sentenced so that a federal court could reach the merits of his claim. The Supreme Court reviewed its earlier decisions in *Kuhlmann, Carrier* and *Smith,* and attempted to fashion an analogous analytical framework for the claim of "innocent of death." *Id.,* ——— U.S. at ———————, 112 S.Ct. at 2520–21. The Supreme Court held that the proper standard in the capital sentencing context for assessing claims of actual innocence is whether a petitioner has shown by clear and convincing evidence that but for a constitutional error at his sentencing hearing, no reasonable juror would find petitioner eligible for the death penalty under state law. *Id.,* ——— U.S. at ———, ———, 112 S.Ct. at 2523, 2525. Although *Sawyer* clearly established a new and heightened test for the actual innocence exception in the context of a challenge to a prisoner's death sentence, the Supreme Court was silent as to the new standard's application in the guilt phases of capital and non-capital cases as well as the sentencing phase of non-capital cases.

In the absence of clear guidance from the Supreme Court, the lower federal courts have struggled to divine the proper scope of *Sawyer.* A split of authority has developed.[12] *Alderman v. Zant,* 22 F.3d 1541 (11th Cir.1994). The Eighth Circuit has held that the clear and convincing standard of *Sawyer* applies equally to challenges to a

conviction and challenges to a sentence of death. *Schlup v. Delo,* 11 F.3d 738, 740 (8th Cir.1993) *cert. granted,* ——— U.S. ———, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994); *Cornell v. Nix,* 976 F.2d 376 (8th Cir.1992) *(en banc),* *cert. denied,* ——— U.S. ———, 113 S.Ct. 1820, 123 L.Ed.2d 450 (1993); *McCoy v. Lockhart,* 969 F.2d 649, 651 (8th Cir.1992). In *McCoy,* an Eighth Circuit panel presented its twofold rationale for its extension of *Sawyer.* First, the *McCoy* panel stated that the Supreme Court in *Sawyer* applied the clear and convincing standard to the underlying conviction. 969 F.2d at 651. Second, the *McCoy* panel noted that the Supreme Court and the Eighth Circuit have consistently applied the same standard to challenges to both a criminal conviction and the imposition of the death penalty. *Id.* at 651–52 *citing Carrier,* 477 U.S. at 497, 106 S.Ct. at 2650; *Smith,* 477 U.S. at 537, 106 S.Ct. at 2668; *McCleskey,* 499 U.S. at 493, 501–04, 111 S.Ct. at 1470, 1474–75; *Edgemon v. Lockhart,* 924 F.2d 126, 129 (8th Cir.1990); and *Stokes v. Armontrout,* 893 F.2d 152, 156 (8th Cir.1989). Thus, the Eighth Circuit currently applies the *Sawyer* clear and convincing standard, at least in the context of a capital case, in both the guilt and sentencing phases.

The Court has considered and rejects the reasons proffered by the Eighth Circuit in support of its broad application of *Sawyer.* The *McCoy* panel put forth two reasons for their holding.[13] First, the panel contends that although the Supreme Court in *Sawyer* announced its new standard in the context of an innocence of the death penalty claim, the Supreme Court also applied the new standard to a challenge to the underlying conviction. Second, the panel contends that the Supreme Court and the Eighth Circuit consistently have applied the same standard to

---

**12.** Not all courts which have considered the Supreme Court's decisions in *Sawyer, Kuhlmann,* and *Carrier* have recognized that the standards annunciated in those cases differ. A Second Circuit panel, when discussing the fundamental miscarriage of justice exception in *Washington v. James,* quoted the *Carrier* standard and, immediately thereafter, quoted the *Sawyer* standard. The *Washington* panel failed to note any difference between the two standards and did not discuss which of the two standards was applicable to the petitioner's claims. 996 F.2d 1442,

1447 (2nd Cir.1993). Rather, the panel appears to have interpreted the two standards as being equivalent. *Id.* The panel went on to apply the *Sawyer* clear and convincing standard to a guilt phase claim in the context of a non-capital case. *Id.*

**13.** The imprimatur of the Eighth Circuit was placed upon *McCoy* holding in *Cornell v. Nix,* 976 F.2d 376 (8th Cir.1992) *(en banc).*

challenges to both a criminal conviction and a sentenced imposed.

The *McCoy* panel's first proffered reason fails to persuade the Court of the wisdom of the panel's approach. The Supreme Court specifically framed the issue in *Sawyer* as involving "the standard for determining whether a petitioner bringing a successive, abusive, or defaulted federal habeas claim has shown 'actual innocence' of the death penalty to which he has been sentenced." —— U.S. at ——, 112 S.Ct. at 2517. The Supreme Court in *Sawyer* then held that "petitioner has failed to show by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty." *Id.,* —— U.S. at ——, 112 S.Ct. at 2525. The limiting language utilized by the Supreme Court in *Sawyer* emphasizes that the Supreme Court intended to limit the application of its newly developed standard to the sentencing phase of a proceeding. Indeed, *Schlup v. Delo,* an Eighth Circuit case following *McCoy,* stated that "*Sawyer* dealt with the punishment phase of the criminal proceeding as opposed to the guilt phase of the trial." 11 F.3d 738, 740 (8th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994).[14] The panel in *Schlup* appeared to be critical of the reasoning employed by the panel in *McCoy,* but was required to follow the holding in *McCoy.* *Id.* The Seventh Circuit in *Mills,* 979 F.2d at 1278–79, and the Eleventh Circuit in *Alderman,* 22 F.3d 1541, 1552 (1994) also interpret *Sawyer* as formulating a standard only for the sentencing phase of a criminal proceeding.

The *McCoy* panel's second proffered reason also fails to persuade the Court. The panel points out that the Supreme Court consistently applied the same test to both challenges arising in the guilt phase and those arising in the sentencing phase. 969 F.2d at 651. As such, the panel reasoned that *Sawyer* must apply to both phases of a proceeding. The panel's argument fails to persuade the Court for two reasons. First, although it is true that the Supreme Court

prior to *Sawyer* consistently applied the same standard, the *Kuhlmann/Carrier* standard, to both phases of a criminal proceeding, at that time only one standard existed to be applied. As the *McCoy* panel itself noted, the Supreme Court in *Sawyer* announced a new rule. *Id.* Thus, the fact that the Supreme Court, prior to *Sawyer,* applied one test to both phases of a proceeding does not necessarily mean that the Supreme Court intended to completely displace the *Kuhlmann/Carrier* standard. Second, the panel's argument based upon consistent application of one standard relies upon the proposition that the *Sawyer* standard displaced any preexisting standard in both the guilt and sentencing phases of a hearing. The Supreme Court's citation to and quotation of the *Kuhlmann* standard in *Herrera* belies such an argument. —— U.S. at ——, 113 S.Ct. at 862. The Court, therefore, rejects the rationale and holdings of the Eighth Circuit in *McCoy* and *Cornell.*

The Fifth Circuit construes *Sawyer* as being of limited applicability. In *Montoya v. Collins,* a death penalty case, one panel in the Fifth Circuit applied the *Kuhlmann* probable innocence standard to the petitioner's guilt phase claims and the *Sawyer* clear and convincing standard to the petitioner's sentencing phase claims. 988 F.2d 11, 12–13 (5th Cir.1993). The *Montoya* court did not annunciate its reasons for applying *Kuhlmann* and *Sawyer* standards in this fashion, nor recognize the Eighth Circuit's contrary holdings.

The Seventh Circuit has, thus far, declined to fully delineate the scope of the *Sawyer* standard. In two apparently contradictory holdings, two panels in the Seventh Circuit arrived at different conclusions as to the proper standard to be applied in the context of a sentencing phase claim made in a non-capital case. The panel in *Mills v. Jordan* held that the actual innocence exception applied in the context of challenge to the sentence imposed in a non-capital case. 979 F.2d 1273, 1278–79 (7th Cir.1992). The *Mills* panel found that a petitioner's claim challenging an enhancement of his sentence based

---

**14.** The Supreme Court granted *certiorari* in *Schlup* to answer the question of whether the *Kuhlmann* or *Sawyer* standard applies to guilt phase claims.

upon his status as a habitual offender should be analyzed under the *Sawyer* standard. *Id.* In so holding, the *Mills* panel first quoted and discussed the *Carrier* standard. *Id.* at 1278. Thus, the panel seemed to, at least implicitly, suggest that the *Carrier/Kuhlmann* standard survived the *Sawyer* decision. In precisely what contexts the *Carrier/Kuhlmann* standard continues to apply was not explained. The panel in *Higgason v. Clark,* a non-capital case, stated that a petitioner challenging his being sentenced as a habitual offender would be required to establish actual innocence under the approach of *Kuhlmann* because his petition was successive. 984 F.2d 203, 206 (7th Cir.1993). The *Higgason* opinion did not cite to, much less attempt to reconcile its opinion with, the holding in *Mills*. In the Seventh Circuit's most recent discussion of the actual innocence exception, the panel in *Milone v. Camp* declined to decide which standard applied to claims arising from the guilt phase of a noncapital trial. 22 F.3d 693, 701 (7th Cir.1994). Rather, the *Milone* panel found it more "efficient" to simply bypass an actual innocence exception analysis and review on their merits the petitioner's unexhausted claims. *Id.* It therefore appears that the question of which standard applies to which phase of a case is an open question in the Seventh Circuit.

This Court believes, contrary to the Eighth Circuit, that the clear and convincing standard laid out in *Sawyer* did not totally displace the colorable showing of probable innocence standard established in *Kuhlmann* and *Carrier*. The Court notes that in *Herrera,* the Supreme Court cites to *Kuhlmann* and quotes with approval its colorable showing of factual innocence standard. —— U.S. at ——, 113 S.Ct. at 862. Chief Justice Rehnquist authored both *Herrera* and *Sawyer,* joined the plurality in *Kuhlmann,* and joined the Supreme Court's opinions in *Smith* and *Carrier*. In light of the Chief Justice's instrumental role in crafting both the *Kuhlmann/Carrier* standard and the *Sawyer* standard, it is difficult to believe that Chief Justice Rehnquist in *Sawyer* would first totally remove the *Kuhlmann/Carrier* standard from actual innocence exception jurisprudence without explicitly stating his intention to do so and then in *Herrera* cite to and quote the standard which he had only a year earlier discredited. Accordingly, the Court finds that the Chief Justice's citation to *Kuhlmann* in *Herrera* is persuasive evidence as to the continued vitality of the *Kuhlmann/Carrier* standard in actual innocence exception jurisprudence.

The Court also finds persuasive as to the continued validity of the *Kuhlmann/Carrier* standard the panel's discussion in *Mills* which indicates that the *Kuhlmann/Carrier* standard survived the *Sawyer* decision. 979 F.2d at 1278–79. In *Mills,* the panel addressed a petitioner's claim that the fundamental miscarriage of justice exception to the procedural default rule applied to allow the panel to address the merits of petitioner's defaulted claims. The petitioner was attacking the constitutionality of a previous conviction which was used as a basis for sentencing the petitioner to an enhanced prison term as a habitual offender. In analyzing the petitioner's miscarriage of justice claim, the panel first cited to and quoted the *Carrier* standard that a constitutional violation "probably resulted in the conviction of one who is actually innocent." *Id.* at 1278, *citing, Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649. The panel noted that in the typical case where a petitioner attacks the conviction for which he is incarcerated, actual innocence refers to the crime for which petitioner is incarcerated. Where the petitioner attacks a previous conviction used to enhance his sentence, however, the panel found that the clear and convincing standard of *Sawyer* should be applied. *Id.* at 1278–79.

The panel in *Mills* appears to indicate from its discussion that although the *Carrier* standard is appropriate in analyzing a claim of actual innocence of the crime for which the petitioner was convicted, the *Sawyer* standard is the appropriate analytical measure for analyzing a claim of actual innocence in the context of a challenge to the correctness of a petitioner's sentence. Such an approach is more in keeping with the Fifth Circuit's approach in *Montoya* than the Eighth Circuit's approach in *McCoy, Cornell,* and *Schlup*. Therefore, *Mills* offers further persuasive evidence that the *Kuhlmann/Carrier*

standard co-exists with the *Sawyer* standard in actual innocence exception jurisprudence.

Given the Court's finding that the *Kuhlmann/Carrier* standard and *Sawyer* standard co-exist in actual innocence exception jurisprudence, the Court must determine in which contexts the standards apply. Two basic phases exist in a criminal proceeding. First, the guilt phase where a defendant is found either guilty or innocent of the crime of which he is charged. Second, the sentencing phase where a convicted defendant's punishment is determined.[15] The Court finds that the *Kuhlmann/Carrier* standard should be applied in the guilt phase of a criminal proceeding, and the *Sawyer* standard applied to the sentencing phase of a criminal proceeding. Thus, a petitioner's argument that the actual innocence exception to the procedural default rule should apply to his claims attacking the validity of his conviction shall be analyzed by this Court under the colorable showing of probable innocence standard of *Kuhlmann* and *Carrier*. A petitioner's argument that the actual innocence exception to the procedural default rule should apply to his claims attacking the validity of his sentence shall be analyzed by this Court under the clear and convincing standard of *Sawyer*.

The Court's decision to adopt a bifurcated analysis of actual innocence exception claims rests upon the presumption of innocence which applies in a criminal proceeding. A defendant charged with a crime is entitled to a presumption of innocence and may insist that his guilt be proved beyond a reasonable doubt. *Herrera*, —— U.S. at ——, 113 S.Ct. at 859 (*citing In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Once, however, a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence dissipates. *Herrera*, —— U.S. at ——, 113 S.Ct. at 860 (*citing Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)). In light of the pre-

sumption of innocence which cloaks a defendant during the guilt phase of a criminal proceeding, the relatively less demanding evidentiary standard of the Kuhlmann/Carrier standard should apply. Once a defendant is convicted, however, the justification for applying the less onerous standard of *Kuhlmann* and *Carrier* dissipates along with the defendant's presumption of innocence. As such, the stricter evidentiary standard of *Sawyer* should apply to actual innocence exception arguments seeking review of procedurally defaulted claims arising in the sentencing phase of a proceeding. Thus, the Supreme Court's opinions in *Herrera* and *Sawyer* may be reconciled by considering the dichotomy of criminal proceeding phases and the presumptions which may or may not accompany them.

The Court's approach in applying the *Kuhlmann/Carrier* and *Sawyer* standards to the guilt and sentencing phases of a criminal proceeding addresses the concerns of the detractors of the *Sawyer* standard and comports with what appears to be the probable approach of the Seventh Circuit were it to address this issue fully. In his concurrence in *Sawyer*, Justice Stevens stated that it would be "heartlessly perverse to impose a more stringent standard of proof to avoid a miscarriage of justice in a capital case than in a noncapital case." —— U.S. at ——, 112 S.Ct. at 2533 (*joined by* Justice Blackmun and Justice O'Connor). This Court's finding that the phase of the proceeding, not the type of punishment imposed, is determinative of the standard to be used in evaluating an actual innocence exception claim cures what Justice Stevens viewed as a perversion. The Court's decision also comports with what the Court believes would be the Seventh Circuit's approach to this issue. The opinion in *Mills* demonstrates that when considering the actual innocence exception, at least one panel in the Seventh Circuit may be leaning in the direction taken by this Court.

---

**15.** Although one could further divide criminal proceedings by categorizing the guilt and sentencing phases into those which are capital and non-capital offenses, the Supreme Court in *Herrera* stated "we have 'refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas

corpus.'" —— U.S. at ——, 113 S.Ct. at 863 quoting *Murray v. Giarratano*, 492 U.S. 1, 9, 109 S.Ct. 2765, 2770, 106 L.Ed.2d 1 (1989). The Supreme Court's statement seems to indicate that a further division on the basis of capital and non-capital cases would be inappropriate.

738

■ The Court has found that Petitioner has procedurally defaulted six of his claims presented in his Petition. In addition, the Court has found that Petitioner has not shown or even argued cause and prejudice in connection with his defaulting these claims. Petitioner has, however, in Ground Two of his Petition, argued that the actual innocence exception to rule forbidding review of procedurally barred claims applies in his case. Therefore, the Court shall analyze Petitioner's claim of actual innocence and determine whether the Court should address on the merits any of Petitioner's guilt and sentencing phase claims.

Petitioner has defaulted four of his guilt phase claims: Ground Two which claims that Petitioner is actually innocent of the crimes for which he was convicted, Ground Three which claims that evidence of dissimilar crimes was erroneously admitted, Ground Four which claims that the prosecutor's opening statements were improper, and Ground Ten which claims that the state court's refusal to give a circumstantial evidence was error. As these are guilt phase claims, the Court shall apply the *Kuhlmann/Carrier* standard to Petitioner's actual innocence argument in relation to these claims. Under the *Kuhlmann/Carrier* standard, Petitioner must show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of fact would have entertained a reasonable doubt of his guilt. *Kuhlmann*, 477 U.S. at 455, n. 17, 106 S.Ct. at 2628, n. 17. Having thoroughly reviewed the record as well as the briefs filed in this case and for the reasons set forth on pages twenty and twenty-one of this Order, the Court finds that Petitioner has failed to make the requisite evidentiary showing of his actual innocence. The substantial evidence of Petitioner's guilt contained in the record is scarcely affected by Petitioner's present arguments and presentation of evidence. The Court is thoroughly convinced that, in light of all the evidence, a trier of fact would entertain no doubt of Petitioner's guilt. Accordingly, the Court is barred from reviewing on the merits Petitioner's defaulted

claims in Grounds Two, Three, Four, and Ten.

■ Petitioner has also defaulted three of his sentencing phase claims: Ground Eleven which claims that Petitioner's death sentence was improperly based upon the trial judge's finding that Petitioner was a clear and present danger, Ground Twelve which claims that Petitioner did not knowingly waive his right to a jury sentencing, and Ground Fourteen which claims that the Illinois death penalty statute is unconstitutional. To successfully argue his actual innocence exception claim in the sentencing phase context, Petitioner must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found Petitioner eligible for the death penalty. *Sawyer*, —— U.S. at ——, 112 S.Ct. at 2523. Under Illinois law, Petitioner could have been sentenced to death if he was eighteen years of age, if he had been found guilty of murder, and if, *inter alia*, the murdered individual was killed in the course of aggravated kidnapping. Ill. Rev.Stat. ch. 38, § 9–1(a) and (b). In sentencing Petitioner to death, the court was required to consider any aggravating or mitigating factors which were relevant to the imposition of the death penalty. ¶ 9–1(c).

The constitutional errors alleged by Petitioner in Grounds Twelve and Fourteen do not relate to Petitioner's actual guilt or innocence of the crimes of which he was convicted or the aggravating factors found by the circuit court judge during sentencing. As such, the actual innocence exception does not excuse their being defaulted. Upon reviewing the sentencing hearing record, the Court also finds that Ground Eleven fails to provide a basis for the application of the actual innocence exception to defaulted claims. The record makes it clear that the state circuit court judge's discussion of Petitioner being a clear and present danger in prison was in response to Petitioner's argument that he would be an asset to the federal penal system. Therefore, the judge's statement was not used as a basis for the imposition of the death penalty. Accordingly, Petitioner has not shown that it would be a fundamental miscarriage of justice for the Court to fail to address on the merits these defaulted claims.

The Court therefore finds that the actual innocence exception to the bar against federal habeas review of procedurally defaulted claims does not apply in Petitioner's case. Accordingly, the Court holds that Petitioner has procedurally defaulted his claims made in Grounds Two, Three, Four, Ten, Eleven, Twelve, and Fourteen, and these Grounds shall not be considered by this Court.

## ANALYSIS OF REMAINING GROUNDS FOR RELIEF

### GROUND ONE

Ground One of the Petition claims that Petitioner's Fifth and Fourteenth Amendment rights were violated by admission of his custodial statements which were made in response to police interrogation. Petitioner contends that while he was in custody and being interrogated, he requested an attorney pursuant to his "Miranda" rights. Petitioner claims that instead of halting their interrogation and arranging for an attorney to be present, the police continued to interrogate him in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Petitioner argues that the State's subsequent use at trial of his custodial statements violated his Due Process rights secured by the *Fifth and Fourteenth Amendments*. Respondent counters by arguing that Petitioner's statements were voluntary *and not the product of interrogation*. Respondent also argues that any error in admitting Petitioner's statements was harmless.

The Court's examination of the record reveals that in the early morning hours of April 23, 1983, Petitioner was arrested and taken into custody, transported to the Peoria Police Department, placed in a holding cell, and then taken to an interview room. Officers Hoskins and Cannon of the Peoria Police Department were present in the interview room and read Petitioner his "Miranda" rights. Petitioner requested an attorney during the reading of his "Miranda" rights and immediately thereafter. Following Petitioner's request, Officer Cannon stated that no further questions would be asked, that Petitioner would be sent to Peoria County Jail and booked for the murder of Kay Burns, that Officer Cannon believed that Pe-

titioner was involved in the murder of Kay Burns, and that a witness or witnesses had observed Petitioner leaving the victim's residence. Petitioner then stated "No, not Kay Burns. Kay Burns?," and proceeded to make several more statements.

At Petitioner's trial, the State attempted to introduce evidence as to Petitioner's custodial statements. Petitioner filed a motion to suppress this evidence. The trial court conducted a hearing on Petitioner's motion at which Officers Cannon and Hoskins testified. The trial court stated that police officers are entitled to tell an arrestee why he is being arrested. The trial court went on to make a finding of fact that, based upon Officer Cannon's testimony, Officer Cannon had stated that no further questions would be asked, that Petitioner would be sent to Peoria County Jail and booked for the murder of Kay Burns, that Officer Cannon believed Petitioner was involved in the murder of Kay Burns, that a witness or witnesses had observed Petitioner leaving Kay Burns' apartment, that Officer Cannon made these statements contemporaneously, and that subsequently Petitioner made the statements sought to be admitted. The trial court then held that Petitioner's statements were voluntary and not the product of interrogation or its functional equivalent.

The Supreme Court of Illinois, on direct review of Petitioner's conviction, considered and rejected Petitioner's due process claim. *People v. Enoch*, 122 Ill.2d 176, 119 Ill.Dec. 265, 522 N.E.2d 1124 (1988). In so doing, the court stated that it was not clear from the record the sequence in which Officer Cannon and Petitioner made their remarks and that the trial court did not discuss the differing evidence as to the sequence of remarks. *Id.* at 192–93, 119 Ill.Dec. 265, 522 N.E.2d 1124. The court apparently missed or simply ignored the trial court's finding as to the sequence of statements, and went on to state that informing Petitioner that he was being booked for the murder of Kay Burns was "clearly a police action 'normally attendant to arrest and custody.'" *Id.* The court, therefore, did not consider Officer Cannon's remarks concerning the existence of eye witness evidence. The court then found that

the trial court's holding that Petitioner's statements were voluntary and not the product of police interrogation was supported by the evidence. In addition, the court found that any error in admitting the evidence was harmless.

■■■■■ After an extensive review of the record in this case, this Court finds that the trial court erred in admitting the custodial statements of Petitioner. Once a defendant invokes his right to have an attorney present, the interrogation must cease until an attorney is present. *Davis v. United States,* — U.S. —, — – —, 114 S.Ct. 2350, 2354–55, 129 L.Ed.2d 362 (1994); *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966); *Lord v. Duckworth,* 29 F.3d 1216 (7th Cir.1994). In the present case, it is uncontested that Petitioner was informed of his *Miranda* rights and that he invoked his right to counsel. What is at issue is whether Officers Cannon and Hoskins continued to interrogate Petitioner after his invocation of his right to an attorney.

The Supreme Court in *Rhode Island v. Innis* held that:

> Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perception of the suspect, rather than the intent of the police.

446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (footnotes omitted). The Seventh Circuit stated in *Killebrew v. Endicott* that "[u]nder *Innis,* the issue is whether a reasonable objective observer would believe that the encounter was 'reasonably likely to elicit an incriminating response from the suspect' and therefore constitute the 'functional equivalent' of interrogation."

992 F.2d 660, 663 (7th Cir.1993) *quoting Innis,* 446 U.S. at 300–01, 100 S.Ct. at 1689–90.

The Court finds that when viewed objectively, the statements made by Officer Cannon were reasonably likely to elicit an incriminating response from Petitioner and, therefore, were the functional equivalent of interrogation. The trial court stated explicitly at the suppression hearing that it was making a finding of fact that Petitioner requested an attorney, that Officer Cannon stated that he told Petitioner that he would be asked no further questions, that he would be sent to Peoria County Jail and booked for the murder of Kay Burns, that Officer Cannon believed he was involved in the murder, and that a witness observed Petitioner leaving the victim's house; and that only after Officer Cannon's remarks, Petitioner made the statements at issue. A reasonable police officer should realize that remarks accusing a suspect of murder and presenting evidence supporting the accusation are likely to elicit a response from the suspect denying the accusation and rebutting the evidence presented. This is exactly what Petitioner did in this case. Petitioner admitted to seeing Ms. Burns and being with Ms. Burns on the night she was murdered, but denied going to her apartment. Although this is a very close case, the Court believes that Officer Cannon's remarks concerning the eyewitness evidence converted what were statements attendant to arrest to interrogation or its functional equivalent. Accordingly, the Court finds that the statements made by Officer Cannon after Petitioner's *Miranda* warning and request for an attorney constituted the functional equivalent of interrogation and, therefore, violated Petitioner's Fifth and Fourteenth Amendment rights.

■■■ Although the Court finds that it was error to admit Petitioner's statements into evidence and that the Supreme Court of Illinois erred in affirming the trial court's finding that Officer Cannon's statements were not interrogation or its functional equivalent, the Court agrees with the Supreme Court of Illinois that such error was harmless. In *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993), the Supreme Court held that the *Kotteakos*

harmless error standard applies in determining whether habeas relief must be granted because of a constitutional error of the trial type. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). "Trial error" occurs during the presentation of evidence to a jury and is "amenable to harmless-error analysis because it 'may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" *Id.*, —— U.S. at ——, 113 S.Ct. at 1717, *quoting*, *Arizona v. Fulminante*, 499 U.S. 279, 280, 111 S.Ct. 1246, 1249, 113 L.Ed.2d 302 (1991). The *Kotteakos* standard is "whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Id. quoting*, *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). However, in an unusual case, "a deliberate or especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury." *Id.*, —— U.S. at —— n. 9, 113 S.Ct. at 1722 n. 9.

The Court finds that error in admitting Petitioner's custodial statements was harmless error. At trial, Officer Hoskins testified that Petitioner had stated "No, not Kay Burns, Kay Burns" in response to Officer Cannon's statements presented above. Officer Hoskins further testified that Petitioner then stated that on the night of Ms. Burns' murder he had gone to Methodist Hospital and had spoken to several people, that one of these people was Ms. Burns, that he offered Ms. Burns some cocaine, that he waited until Ms. Burns got off work and walked part of the way home with Ms. Burns, that he stopped about one block from Ms. Burns' apartment and gave her some cocaine in a matchbook cover, that he then turned and walked back toward Methodist, and that he eventually went home. The introduction of these statements into evidence was trial error. The admission of Petitioner's statements occurred during trial and is of the type that can be "quantitatively assessed" in the context of other evidence introduced at Petitioner's trial. Thus, harmless error analysis is appropriate.

The admission of Petitioner's custodial statements was, for several reasons, harmless error. First, the prosecution's references to the statements were infrequent. Petitioner points to only eight pages out of the over 900 page trial transcript where the prosecution made mention of Petitioner's custodial statements. Second, the prosecution's references to Petitioner's statements were cumulative of evidence properly introduced at trial. Three witnesses, Gregory Taylor, Gregory Hunter, and Michael Callen, testified at trial to facts similar, if not identical, to the facts contained in many of Petitioner's statements. These witnesses testified that Petitioner was present in the housekeeping office at Methodist on the night Ms. Burns was murdered, Petitioner spoke with people present in the office including Ms. Burns, Petitioner waited at Methodist until Ms. Burns' shift ended, Petitioner accompanied Ms. Burns on her walk home, both Ms. Burns and Petitioner seemed at ease and relaxed when walking, and Petitioner was last seen with Ms. Burns approximately 100 feet from her home. Third, the statements admitted at trial were not prejudicial to Petitioner. The statement "No, not Kay Burns, Kay Burns" indicates shock and sadness, not guilt. The statements concerning Petitioner's movements were corroborated by the prosecution's own witnesses and indicated that Petitioner was not present at the murder scene. Indeed, Petitioner alleges in Ground Five and Ground Seven of his Petition that his counsel was ineffective because he cross-examined too aggressively prosecution witnesses who testified that Petitioner met Ms. Burns at the hospital, spoke with her, left with her, and walked a portion of the way home with her. Fourth, the prosecution's evidence of Petitioner's guilt was overwhelming. Petitioner's statements are dwarfed by the weight of the evidence produced by the prosecution which indicated Petitioner's guilt.

It is plain from the record that the admission of Petitioner's custodial statements had neither substantial nor injurious influence in determining the jury's verdict in this case. Accordingly, admission of these statements into evidence was no more than harmless

error under *Brecht*. In addition, the Court finds that this is not an "unusual case" where a deliberate and egregious trial error or a trial error combined with a pattern of prosecutorial misconduct so infected the integrity of Petitioner's trial as to warrant habeas relief in the absence of any substantial influence on the jury's verdict. Accordingly, the Court finds that Petitioner's Ground One lacks merit and is not a proper basis upon which to grant habeas relief in this case.[16]

## GROUNDS FIVE & SIX

Ground Five of the Petition claims that Petitioner's trial attorney, Mark Rose, suffered a conflict of interest which denied Petitioner effective assistance of counsel. Ground Six of the Petition claims that the trial court failed to conduct an adequate hearing on Rose's conflict of interest and whether Petitioner would or could waive it. Petitioner notes that his attorney, Mark Rose, had previously represented one of the prosecution's key witnesses, Derek Proctor. Petitioner argues that Rose's previous representation of Proctor created a conflict of interest which adversely affected Rose's representation of Petitioner in his trial. In particular, Petitioner alleges that Rose's cross examination of Proctor was inadequate and lists thirty additional examples of Rose's ineffective performance. Respondent argues that Petitioner has failed to demonstrate that Rose suffered from a conflict of interest and that, even if such a conflict did exist, Petitioner has failed to demonstrate that Rose's representation of Petitioner was adversely affected by the conflict.

Counsel have an ethical obligation to advise a court promptly when the potential for a conflict of interest arises. *Cuyler v. Sullivan*, 446 U.S. 335, 346–47, 100 S.Ct. 1708, 1717–18, 64 L.Ed.2d 333 (1980). Immediately prior to the commencement of the trial in the present case, Rose informed the court that he had previously represented a witness for the prosecution, Derek Proctor. The circuit court promptly conducted a hearing into the matter of Rose's previous representation of Proctor to determine if such

representation would constitute a conflict of interest in Rose's representation of Petitioner. The court's investigation into the alleged conflict revealed that four years earlier, Rose had represented Proctor in an unrelated criminal matter in which Proctor had been charged with burglary. This criminal matter was entirely separate and factually distinct from the present case and did not involve Petitioner. Following Rose's representation of Proctor in connection with the burglary matter, Proctor visited Rose's office apparently to seek counsel in another matter. Rose did not represent Proctor on this later occasion. Rose stated that he had forgotten that he had acted as Proctor's counsel until he obtained a certified copy of Proctor's conviction. Rose stated that his prior representation of Proctor would not pose any difficulty in his representing Petitioner. Rose also stated that no attorney/client relationship existed between Proctor and himself. The circuit court found that Rose's representation of Proctor did not constitute a conflict of interest.

Assistance by counsel free from conflicts of interest is implicit in the Sixth Amendment's guarantee of effective assistance of counsel. *Cates v. Superintendent, Indiana Youth Center*, 981.F.2d 949, 953 (7th Cir.1992) *citing, Cuyler*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Ordinarily, conflict of interest claims arise in situations where a single attorney represents two or more defendants in the same criminal proceeding. However, an actual conflict of interest would arise when defense counsel is unable to effectively cross-examine a prosecution witness because the attorney had previously represented the witness. *Ross v. Heyne*, 638 F.2d 979, 983 (7th Cir.1980); *Cowell v. Duckworth*, 512 F.Supp. 371, 373–75 (N.D.Ind.1981). The court stated in *Ross*:

> The problem that arises when one attorney represents both the defendant and the prosecution witness is that the attorney may have privileged information obtained from the witness that is relevant to cross-examination, but which he refuses to use

---

**16.** Petitioner's claim of ineffective assistance of counsel based upon Petitioner's attorney's performance in connection with the motion to sup-

press shall be addressed in Petitioner's claims asserting ineffective assistance of counsel.

for fear of breaching his ethical obligation to maintain the confidences of his client. (citations omitted). "The more difficult problem which arises is the danger that counsel may overcompensate and fail to cross-examine fully for fear of misusing his confidential information." *United States v. Jeffers,* 520 F.2d 1256, 1265 (7th Cir.1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976).

638 F.2d at 983.

Petitioner argues that pursuant to *Cuyler v. Sullivan,* Rose's representation of Petitioner was ineffective. *Cuyler* requires that a petitioner demonstrate both that an actual conflict of interest exists and that as a result of the conflict his attorney's performance was adversely affected. *Stoia v. United States,* 22 F.3d 766, 770 (7th Cir.1994). The Seventh Circuit does not recognize any *"per se"* Sixth Amendment violations. *Id.* at 770 n. 4. Rather, ineffective assistance claims "stand or fall on the particular facts of the case." *Cates,* 981 F.2d at 955. Having thoroughly reviewed the record in this case and the state circuit court's inquiry into Rose's previous representation of Proctor, the Court finds that Petitioner has failed to demonstrate that a conflict of interest existed and that Rose's performance was adversely affected by any supposed conflict.

■■■ It is clear in this case that Petitioner has failed to demonstrate that Rose was burdened by a conflict of interest arising from his previous representation of Proctor. It has not been shown that Rose's representation of Proctor bore any factual relation to the present case. In addition, it has not been shown that Petitioner was in any way involved in Proctor's earlier crime, trial, or conviction. The panel in *Small v. Endicott* stated that:

Like the district court, we do not find a conflict of interest where there exist separate and distinct criminal cases involving neither the same parties nor the same facts.

998 F.2d 411, 417 (7th Cir.1993). Similarly, this Court finds no conflict of interest in the present case where Proctor's earlier criminal matter neither involved Petitioner nor was in any manner factually related to Petitioner's

case. Where the previous representation of a prosecution witness by an attorney is without any relationship to the current representation of a defendant, it is difficult to envision what privileged information garnered from the previous representation would hamper the zealous cross-examination of the prosecution witness by the attorney in the current case. Petitioner's allegations are at best speculative. *See Griffin v. West,* 791 F.2d 1578, 1582 (10th Cir.1986); *United States v. Winkle,* 722 F.2d 605, 610 (10th Cir.1983); *United States v. Martinez,* 630 F.2d 361, 363–64 n. 2 (5th Cir.1980); *United States v. Valdez,* 149 F.R.D. 223, 227 (C.D.Utah 1993). Even assuming, *arguendo,* that a conflict did exist, Petitioner, in face of the overwhelming evidence of his guilt, has failed to demonstrate that the conflict of interest adversely affected Rose's performance. Accordingly, the Court finds that Ground Five of the Petition is without merit and does not provide a basis upon which habeas relief may be granted in this case.

■■ Ground Six of the Petition is similarly without merit. Upon having Rose's prior representation of Proctor brought to its attention, the state circuit court immediately conducted an inquiry into the matter. The circuit court found that no conflict of interest existed. Petitioner attacks this finding by stating that the state circuit court summarily ruled that because Rose was not currently representing Proctor, there was no conflict of interest. Petitioner, not for the first time in his Petition, plays fast and loose with the facts. The circuit court did not explicitly premise its finding that no conflict of interest existed upon the fact that Rose did not currently represent Proctor. Nor did the circuit court "summarily" rule on the conflict issue. Rather, the record reveals that the circuit court inquired into the circumstances of Rose's prior representation of Proctor, what relationship between Proctor and Rose existed prior to and at the time of Petitioner's trial, and whether Rose would have any difficulty representing Petitioner as a result of having represented Proctor. The circuit court's inquiries were probative and its ruling was not summary. Indeed, since the primary concern in a situation such as this is

whether the attorney feels hampered in cross-examining his former client, the circuit court's inquiry was well-framed. Accordingly, the Court finds that Ground Six of the Petition is without merit and does not provide a basis upon which habeas relief may be granted in this case.

### GROUND SEVEN

■ Ground Seven of the Petition claims that Petitioner's trial counsel's, Mark Rose's, assistance was ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner alleges that Rose's performance was deficient because Rose did not adequately cross-examine Proctor. Petitioner also offers an additional thirty examples of what he feels is Rose's deficient performance. These examples generally concern Rose's alleged failure to interview witnesses, to investigate, to use exculpatory evidence, and to use evidence he had suggesting Proctor's guilt. Respondent argues that Petitioner has failed to demonstrate that Rose's performance was so deficient as to constitute a Sixth Amendment violation and that Petitioner was not prejudiced by any alleged deficiency.[17]

To make out a claim of ineffective assistance of counsel under *Strickland v. Washington,* Petitioner must demonstrate: 1) that Rose's representation of Petitioner at trial fell below an objective standard of reasonableness, and 2) that a reasonable probability exists that, but for his attorney's unprofessional representation, the result of the proceedings would have been different. 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). Failure to satisfy either of these two prongs is fatal to a claim. *United States v. Slaughter,* 900 F.2d 1119, 1124 (7th Cir.1990). If a claim of ineffective assistance of counsel can be disposed of using the prejudice prong alone, that course should be followed. *Smith v. Lane,* 794 F.2d 287, 290 (7th Cir.1986). The Supreme Court in

*Strickland* in regard to the examination of the conduct of counsel stated:

> Judicial scrutiny of counsel's performance must be highly deferential.... A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in particular cases. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

466 U.S. at 689–90, 104 S.Ct. at 2065–66. Upon reviewing the briefs and record in this case, the Court finds that Petitioner has failed to establish either prong of the *Strickland* test.

Petitioner identifies a laundry list of acts and omissions which he claims constitute ineffective assistance of counsel on behalf of his trial counsel, Rose. These acts and omissions can be grouped, as identified by Petitioner, into four basic areas: failure to investigate and prepare for trial, failure to adequately represent Petitioner during the proceeding's guilt phase, failure to adequately represent Petitioner at sentencing, and failure to file a written post-trial motion for new trial. The Court shall examine each of these areas *seriatim* to determine if Rose's performance was so deficient as to constitute ineffective assistance of counsel and, if so, whether Petitioner was prejudiced by the deficiency.

---

17. Respondent also contends that Petitioner waived this claim because he failed to raise it on direct appeal. However, the Illinois Supreme Court, although first noting that the question of ineffectiveness of counsel "may be deemed waived," addressed Petitioner's claim on the merits and found that the claim was clearly un-supported by the record. *Enoch,* 165 Ill.Dec. at 724–25, 585 N.E.2d at 120–21. As such, the Court finds that Petitioner has not procedurally defaulted this claim. *See Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

■ The first group of acts and omissions presented by Petitioner centers around Petitioner's claim that Rose did not adequately prepare for trial. Petitioner complains that Rose did not seek to suppress Petitioner's custodial statements until mid-trial because he misread a police report; Rose did not investigate the accurate distance from the time clock at Methodist Medical Center to Ms. Burns' apartment and how long it would take to walk such a distance; Rose did not interview witnesses that claimed to see Proctor in a downtown bar's parking lot at approximately 12:30 a.m.; Rose did not interview or call as a witness a security guard who heard screaming at approximately 3:30 a.m.; and that Rose did not interview and call as a witness Octavia Burchett.

■ The Court finds Petitioner has not demonstrated that he was prejudiced by any of Rose's alleged inadequacies. Although Rose filed the motion to suppress mid-trial, the circuit court noted that the delay was in good faith and found that the motion was not untimely. In addition, a hearing was held on the motion and the record indicated no bias or prejudice on behalf of the state circuit court. As such, Petitioner experienced no prejudice from Rose's delay in filing. Rose's failure to investigate the distance from the time clock to Ms. Burns' apartment and the time required to walk such a distance also fails the prejudice prong. Attempts to make nice calculations of precise times in a case where witnesses can generally make only rough estimates of the times of occurrences is of little probative value. Given the weight of evidence of Petitioner's guilt, no prejudice was experienced by the Petitioner in this regard. Rose's failure to call witnesses to testify to seeing Proctor in a parking lot at 12:30 a.m. also did not prejudice Petitioner. Petitioner argues that this information would be valuable in the impeachment of Proctor. However, Rose did attempt to bring into doubt Proctor's version of the events prior to Ms. Burns' murder. The Court cannot find that this additional testimony would have affected the outcome of trial given the other evidence presented in this case. Similarly, the Court finds no prejudice in failing to present the testimony as to screams heard approximately one and one-half hours after Proctor and Burns' brother arrived at her apartment. Finally, no prejudice occurred as a result of Rose's failure to interview and call as a witness Octavia Burchett. Rose elicited testimony from Pate herself as to her discussions with Burchett. Burchett's testimony would have been no more than cumulative.

■ The second group of acts and omissions presented by Petitioner centers around Rose's conduct at trial. Petitioner claims that Rose failed to mention any evidence or offer any theory of the case in his opening statement. It is clear from Rose's comments in his opening that his failure to mention evidence or present a theory was intentional and part of his strategy. The Court shall not second guess Rose's strategy and finds that his representation did not fall below an objective standard of reasonableness. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066–67. In addition, the Court finds that it is not probable in light of all the evidence in this case that the result of the proceedings would have been different had Rose presented a theory of the case in his opening.

■ Petitioner also claims that questioning of certain witnesses was ineffective. First, Petitioner argues that Rose did not effectively cross-examine Proctor. Specifically, Petitioner argues that Rose failed to adequately question Proctor about being a suspect, about being detained by the police, about being released only after incriminating Petitioner, did not ask why Proctor waited one and one-half hours after he saw Petitioner leaving Ms. Burns' apartment carrying a bloody shirt before summoning help,[18] and did not inform the jury of Proctor's inconsistent statements. Upon reviewing the record, the Court finds that Rose's cross-examination of Proctor was competent and effective. Rose pointed out the contradictions between Proctor's statements to police and his testimony at trial. Rose also aggressively questioned and impeached Proctor concerning his

---

18. The Court notes that contrary to Petitioner's statement, Proctor did not testify that the shirt he observed Petitioner carrying had blood on it.

testimony as to the timing of his arrival at Ms. Burns' apartment and his activities on the day of Burns' murder. Rose also confronted Proctor with Ragon's statement that Proctor had told him at approximately 12:15 a.m. that a window was broken at Burns' apartment and that he saw a man leaving Burns' apartment. Additionally, Rose raised Proctor's previous convictions for burglary and deviate sexual conduct. The Court finds that in addition to Rose's cross-examination being competent, additional cross examination as to Proctor being a suspect at the inception of the investigation would probably not have altered the result of the trial. Indeed, in his closing argument, Rose argued that Proctor was the true murderer.

Second, Petitioner argues that Rose failed to bring out on cross-examination that Ms. Burns and Petitioner were casually walking and talking and did not appear upset, that Rose did not impeach Pate concerning her testimony about the similarities of the knife found by the police and her missing knife, that Rose did not cross-examine Pate concerning her severe emotional distress and attempt at suicide following her appearance before the grand jury, and that Rose too aggressively cross-examined Greg Hunter. The Court finds that Petitioner's arguments are without merit. The testimony of Hunter and Callen established that Petitioner and Ms. Burns were casually walking and that she did not appear upset or fearful. In addition, Rose did cross-examine Pate as to the dissimilarities between the knife found by police and her missing knife. The jury was also apprised of the dissimilarities on direct examination and by Rose's many objections which clarified the differences in the knives. As for Rose's cross-examination of Hunter, the Court does not find that it was so unadvisable as to constitute ineffective assistance. Rose's cross-examination of other witnesses who observed Petitioner and Ms. Burns together was not as aggressive, thus mitigating any harm presumed by Petitioner. Finally, the Court notes that any failure on Rose's part in this area would not have likely changed the outcome at trial.

Petitioner further claims that Rose was ineffective because he failed to introduce or adequately challenge certain pieces of evidence and that Rose failed to stress key evidentiary points. Petitioner first complains that Rose did not introduce Ms. Burns' time card, did not show that the paper sheath made by Petitioner was too large for the knife found by the police, and did not bring out that Proctor had described the man leaving Ms. Burns' apartment as being between 5′9″ and 5′10″. Petitioner is only between 5′5″ and 5′6″ tall. With this argument, Petitioner attempts to make a mountain out of an evidentiary mole hill. The above evidence presents fine distinctions in a case which necessarily involves coarse differences. As such, it was reasonable or certainly not unreasonable for Rose not to introduce the evidence, and Petitioner was certainly not prejudiced by Rose's failure to do so.

Petitioner also complains that Rose was ineffective because he failed to explain that Ragon's testimony had to be truthful because he filled out an incident report, failed to point out that no witnesses corroborated Proctor's story, failed to mention that Petitioner's fingerprints were not found at Ms. Burns' apartment, failed to challenge Pate's testimony as to Petitioner burning his pants, and failed to challenge the prosecution's assertion that the blood-stained shirt was Petitioner's. Contrary to Petitioner's assertions, Rose did present many of the above points. Rose brought out that Ragon kept an incident log which included times and argued the veracity of Ragon's testimony at closing. Rose, although not referring specifically to the testimony concerning the burned pants and bloody shirt, did attempt to undermine the credibility of this evidence during its introduction and during closing argument. Further, the Court finds that Rose's failure to more directly confront this evidence, failure to stress to the jury that Petitioner's fingerprints were not found in Ms. Burns' apartment, and failure to stress that no witnesses corroborated much of Proctor's testimony was not unreasonable and did not prejudice Petitioner.

Petitioner also complains that Rose was ineffective in representing Petitioner at the suppression hearing held to determine the admissibility of prior crime evidence.

Petitioner specifically states that Rose was ineffective because he failed to inform the circuit court of the "manifest dissimilarities" between Petitioner's previous crimes and the present case and because Rose did not inform the state circuit court judge that Proctor had been convicted of deviate sexual conduct wherein he had bound his victim's hands behind her back. Upon reviewing the record of the suppression hearing, it is clear to this Court that Rose made a strong and competent effort to have the prior crime evidence excluded. Rose argued that the crimes were not sufficiently similar because, *inter alia*, the locations, times, circumstances, and methods of confrontation were all different. In addition, Rose argued that in the cases of Burnside and McClain, the attacker did not know the victim while in the present case, Petitioner and Ms. Burns were acquainted. Finally, Rose argued that no peculiar activities linked the crimes. It is clear that Rose's efforts were reasonable in attempting to differentiating the crimes. Also, since details of Proctor's prior crime were irrelevant to the matter of Petitioner's prior crimes, it was reasonable that Rose not introduce such facts in the suppression hearing. Thus, the Court finds that Rose's performance in the suppression hearing was reasonable and in any event did not prejudice Petitioner in light of all the evidence in the case.

■ Petitioner also complains that Rose was ineffective because he failed to tender an instruction on the offense of unlawful restraint. The Court finds that Rose's failure to tender such an instruction was neither unreasonable nor did it prejudice Petitioner. The Supreme Court in *Hopper v. Evans* stated that "due process requires that a lesser included offense be given *only* when the evidence warrants such an instruction." 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982). Unlawful restraint requires that an individual knowingly detain another without legal authority to do so. Ill.Rev.Stat.1983, ch. 38, ¶ 10–3. Kidnapping requires the secret confinement of an individual against her will. Ill.Rev.Stat.1983, ch. 38, ¶ 10–1. Aggravated kidnapping occurs when a kidnapper inflicts great bodily harm upon a victim or when an individual commits the offense of kidnapping while armed with a dangerous weapon. Ill.Rev.Stat.1983, ch. 38, ¶¶ 10–2(a)(3) and (5). The evidence in this case clearly shows that Ms. Burns was more than merely detained without authority. Ms. Burns' hands were bound tightly behind her back with a coat hanger, her presence inside her apartment was kept secret from Proctor, there were blood stains throughout most of the apartment, a knife was used to inflict the wounds, and the many and various wounds inflicted upon Ms. Burns by her assailant resulted in her death. It is reasonable in light of the evidence in this case that Rose not tender an instruction on unlawful restraint and his failure to do so did not prejudice Petitioner.

■ The third group of acts and omissions presented by Petitioner centers around the sentencing phase of the present case. Petitioner claims that Rose was ineffective because he failed to rebut the prosecution's argument that no mitigating factors existed with evidence from Officer Hoskins that Petitioner and Ms. Burns "shared" cocaine (a drug that creates extreme mental and emotional disturbances) and failed to point out that this was a mitigating factor. The Court need spend little time considering this argument. Petitioner attempts to suggest that Officer Hoskins testified that Petitioner and Ms. Burns consumed cocaine. Petitioner blatantly misrepresents the evidence. Officer Hoskins testified only that Petitioner poured some cocaine into a match cover and gave it to Ms. Burns. The record is quite completely barren of any suggestion that Petitioner consumed cocaine during the time frame relevant to this case. Accordingly, Rose's failure to suggest such a mitigating factor was not only reasonable, it was professionally and ethically proper. The Court cannot say as much for the performance of Petitioner's attorneys in this regard. Thus, Rose was not ineffective for failing to argue cocaine usage as a mitigating factor.

■ The fourth group of acts and omissions presented by Petitioner centers upon Rose's post-trial actions. Petitioner claims that Rose was ineffective because he failed to file a written post-trial motion for a new trial. Rose's failure resulted in the Illinois Su-

preme Court finding that Petitioner waived a number of his claims. The Court finds that Rose's failure did not result in his representation of Petitioner falling below an objective standard of reasonableness and did not result in any prejudice to Petitioner.

Ill.Rev.Stat. ch. 38, ¶ 9–1(i), mandates that the Illinois Supreme Court automatically review death penalty convictions and sentences. In capital cases, appeals are automatically perfected upon the sentence of death. Ill. Sup.Ct. Rule 606(a). Ill.Rev.Stat. ch. 38, ¶ 116–1, requires that a written post-trial motion for a new trial be filed within thirty days of a verdict. Although the clear language of ¶ 116–1 indicates that it is of general application and contains no limiting language as to its scope, ¶ 116–1 does not explicitly state that it is applicable to death penalty cases. Thus, Rose was confronted with the question of whether, in the context of a capital case which is automatically appealed and perfected, it is necessary to file a written motion for a new trial. Rose researched the law, consulted with the trial judge in Petitioner's case, and consulted with other public defenders. Neither the trial judge nor the public defenders could answer Rose's question. Illinois case law, although uniformly requiring a post-trial motion for new trial to preserve issues, did not contain a capital case involving a § 116–1 issue. Rose concluded that no written motion for a new trial was required and, therefore, did not file one. Unfortunately for Petitioner, Rose was incorrect. Although the Court finds that Rose's failure to file a post-trial motion was contrary to the clear language of the statute and uniform case law in Illinois, the Court finds that Rose's erroneous conclusion was not so misguided and unreasonable as to rise to the level of a Sixth Amendment violation.[19]

■ Even if the Court were to assume *arguendo* that Rose's error was deficient under *Strickland*, Petitioner has not demonstrated that he was prejudiced by Rose's failure to file a motion for new trial. As a result of Rose's failure to file the appropriate motion, the Illinois Supreme Court found that Petitioner had waived his claims that:

evidence of dissimilar crimes was erroneously admitted, the prosecutor's opening remarks improperly prejudiced Petitioner, the circuit court's refusal to give a full circumstantial evidence instruction denied Petitioner a fair trial, Petitioner's death sentence was improperly based upon the circuit court's finding that Petitioner was a clear and present danger, and Petitioner did not knowingly and intelligently waive his right to a jury sentencing. The Court, upon examining the record and the briefs filed in this case, finds that the claims waived by Petitioner are meritless and, therefore, Petitioner incurred no prejudice from Rose's error.

■ The evidence of Petitioner's prior crimes was sufficiently similar to be admissible at trial. Similarities such as the binding of the victims' hands behind their backs with objects available at the crime scene, the use of a knife or sharp object during the commission of the crimes, Petitioner's demonstrated willingness to use the weapon, and the threat to cut a victim's throat make the prior crime evidence probative in the present case. Also, Petitioner was not denied a fair trial because a fully circumstantial evidence instruction was not given. Although the evidence presented in this case was primarily circumstantial in nature, it was not wholly circumstantial. Petitioner was similarly not denied a fair trial by the prosecutor's opening remarks. Even assuming that the prosecutor's remarks were improper, the Court finds that, in light of the record as a whole, the prosecutor's remarks did not deny Petitioner a fair trial. The nature and seriousness of the prosecutor's remarks, the strength of the evidence of Petitioner's guilt, and Petitioner's ability to rebut the prosecutor's remarks make clear that Petitioner was not deprived of a fair trial. *See United States v. Badger,* 983 F.2d 1443, 1450 (7th Cir.1993). The Court finds that the prosecutor's remarks did not so infect the trial that Petitioner was denied due process. In addition, the state circuit court did not improperly base Petitioner's death sentence on a finding that Petitioner was a clear and present danger. The circuit court's statement concerning the

19. Indeed, Petitioner argues in Ground Thirteen that Rose's confusion as to the necessity of filing

a post-trial motion for a new trial was understandable and logical.

danger posed by Petitioner was in response to Petitioner's argument that he would be useful and helpful to other prisoners while in prison. Finally, an examination of the record makes it clear that Petitioner did knowingly and intelligently waive his right to be sentenced by a jury. The Court finds that the circuit court's explanation of the unanimity requirement at the guilt phase was plain, readily understandable, and proper. Accordingly, the Court finds Rose's representation of Petitioner was not ineffective and that, in any event, Petitioner suffered no prejudice as a result of any alleged ineffectiveness on the behalf of Rose. Therefore, Ground Seven of the Petition is without merit and does not provide a basis upon which habeas relief may be granted in this case.

## GROUND EIGHT

Ground Eight of the Petition claims that Petitioner was improperly convicted of aggravated kidnapping and then found eligible for the death penalty based upon that conviction. Petitioner claims that the evidence adduced at trial was insufficient to support Petitioner's conviction for aggravated kidnapping. For Petitioner to succeed in his claim, he must demonstrate that when viewing the evidence in a light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Badger*, 983 F.2d 1443, 1448 (7th Cir.1993) *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Upon reviewing the evidence in this case, the Court finds that sufficient evidence did exist whereby a rational trier of fact could have found the essential elements of aggravated kidnapping beyond a reasonable doubt.

The offense of kidnapping occurs when a person knowingly and secretly confines another against his will. Ill.Rev.Stat. ch. 38, ¶ 10–1(a)(1). The offense of aggravated kidnapping occurs when a kidnapper, as defined under ¶ 10–1, inflicts great bodily harm upon the victim or commits the offense of kidnapping while armed with a dangerous weapon.

Ill.Rev.Stat. ch. 38, ¶ 10–2(a)(3) and (5). The evidence in this case establishes all of the essential elements of the crime of aggravated kidnapping beyond a reasonable doubt. Evidence adduced at trial indicates that nobody actually witnessed Petitioner and Burns enter her apartment and that Proctor attempted to contact Burns in her apartment by ringing her doorbell on several different occasions, calling her at her apartment, knocking on the windows of her apartment, and going to her place of work to determine her whereabouts. In addition, the evidence showed that Ms. Burns' hands were tightly bound behind her back, that she may have been gagged, and that blood trails were found through the apartment indicating an attempt to flee by the victim. Finally, the evidence clearly indicated that Petitioner inflicted great bodily harm upon Ms. Burns and that a knife was used to inflict her wounds. Thus, the evidence adduced at trial, when viewed in a light most favorable to the prosecution, establishes that a rational trier of fact could have found that the elements of aggravated kidnapping existed beyond a reasonable doubt.

Petitioner argues that the confinement in this case was only momentary and incidental to the act of murder, that evidence of prior crimes was improperly admitted, and that the trial court erred in not giving an instruction on unlawful restraint. Petitioner's arguments are meritless. The evidence in this case clearly shows that Petitioner's confinement of Ms. Burns was far more than merely "momentary" and that the confinement was more than simply "incident to the act of murder." In addition, the evidence clearly demonstrates that an instruction on the offense of unlawful restraint was not only not required, but would have been improper. A person commits the offense of unlawful restraint when he knowingly and without legal authority detains another. Ill.Rev.Stat. ch. 38 ¶ 10–3(a). The evidence in this case does not support a finding that Petitioner merely detained Ms. Burns without authority. Therefore, the trial court properly did not give an instruction on unlawful restraint.[20]

---

**20.** Indeed, since Petitioner did not tender an unlawful restraint instruction, the trial court was not required to *sua sponte* give an unlawful restraint instruction.

*See Hopper*, 456 U.S. at 611, 102 S.Ct. at 2052. Finally, since evidence other than the prior crimes evidence more than adequately supports Petitioner's aggravated kidnapping conviction, Petitioner's complaint concerning such evidence is not persuasive. The Court, in any event, finds that the evidence of Petitioner's prior crimes was properly admitted at trial. Accordingly, the Court finds that Petitioner's Ground Eight lacks merit and is not a proper basis upon which to grant habeas relief in this case.

*GROUND NINE*

■ Ground Nine of the Petition claims that Petitioner was improperly convicted of attempt rape and then found eligible for the death penalty based upon the conviction. Petitioner claims that the evidence adduced at trial was insufficient to support Petitioner's conviction for attempt rape. For Petitioner to succeed in his claim, he must demonstrate that when viewing the evidence in a light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Badger*, 983 F.2d at 1448, citing, *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Upon reviewing the evidence presented in this case, the Court finds that sufficient evidence existed whereby a rational trier of fact could have found the essential elements of attempt rape beyond a reasonable doubt.

■ To sustain a conviction for attempt rape, proof of specific intent to commit rape is essential. *People v. Beason*, 32 Ill.App.3d 305, 307, 336 N.E.2d 511 (1975). Petitioner contends that the element of intent was not satisfied because evidence of prior crimes was wrongfully admitted, that evidence of disrobement was the only evidence as to intent, and that disrobement is not by itself sufficient to prove intent. The Court must disagree with Petitioner. The intent element in attempt rape "may be inferred from the conduct of the defendant, the character of the assault, the acts done, and the time and place of the occurrence." *People v. Williams*, 128 Ill.App.3d 384, 83 Ill.Dec. 720, 729, 470 N.E.2d 1140, 1149 (1984). In *Williams*, the victim had been disrobed from the waist down, beaten, and dragged to an isolated area. *Id.* The *Williams* court found such evidence sufficient to infer the necessary intent to support a conviction for intent rape. *Id., citing in support, People v. Bonner*, 37 Ill.2d 553, 229 N.E.2d 527 (1967); *Beason*, 32 Ill.App.3d at 336, 336 N.E.2d 511; *People v. Almond*, 31 Ill.App.3d 374, 333 N.E.2d 236 (1975). In the present case, Ms. Burns had been disrobed below the waist, her jacket and shirt had been pulled down, her bra was slightly raised, her hands had been bound, there was evidence that she may have been gagged, and she had been effectively isolated by Petitioner in her apartment. The Court finds this evidence more than sufficient to support Petitioner's conviction for attempt rape.

Since the Court finds that the evidence presented at trial was sufficient to demonstrate the intent element in the offense of attempt rape, the Court need not address Petitioner's argument concerning prior crime evidence. Therefore, the Court finds that Petitioner's Ground Nine lacks merit and is not a proper basis upon which to grant habeas relief in this case.

*GROUND THIRTEEN*

■ Ground Thirteen of the Petition claims that the Illinois Supreme Court created a new waiver rule on Petitioner's direct appeal thereby denying him a fair appeal of his conviction and sentence. Petitioner argues that when reviewing Petitioner's case on direct appeal, the Supreme Court of Illinois created a new and unforeseeable rule by applying the requirements of Ill.Rev.Stat. ch. 38, ¶ 116–1 to his capital case. Petitioner claims that the Illinois Supreme Court retroactively applied this supposedly new and unforeseeable waiver rule to his case thereby depriving him of liberty without due process of law in contravention of the Fourteenth Amendment. Respondent argues that there was no retroactive application of a newly announced waiver rule in Petitioner's case.

Petitioner argues that no pre-existing law warned him that he was required to file a motion for new trial under Ill.Rev.Stat. ch. 38, ¶ 116–1. This statute states, in pertinent part, that:

A written motion for a new trial shall be filed by the defendant within 30 days following the entry of a finding or return of a verdict.

§ 116–1(b). Petitioner notes that in a capital case, the Supreme Court automatically reviews the sentence and conviction of death, and appeals are automatically perfected. Ill. Rev.Stat. ch. 38, ¶ 9–1(i); Ill.Sup.Ct. Rule 606(a). In light of ¶ 9–1(i) and Rule 606(a), Petitioner argues that the application of ¶ 116–1 to his capital case by the Supreme Court of Illinois was unforeseeable and constituted a new interpretation of ¶ 116–1. Petitioner, citing *Bouie v. Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), *Ford v. Georgia*, 498 U.S. 411, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991), and *Douglas v. Buder*, 412 U.S. 430, 93 S.Ct. 2199, 37 L.Ed.2d 52 (1973), argues that by creating this new waiver rule and then applying it retroactively to his case, the Supreme Court of Illinois violated his due process rights secured by the Fourteenth Amendment. The Court cannot agree with Petitioner's argument.

The cases cited by Petitioner, *Bouie, Ford,* and *Buder,* are distinguishable on their facts from the present case. *Bouie* involved a situation where sit-in demonstrators were arrested and charged under a South Carolina criminal trespass statute which, by its terms, prohibited only entry upon the lands of another after notice from the owner prohibiting entry. In *Bouie,* the demonstrators had not been given notice that their entry was prohibited, but rather, were told to leave after entering the premises. Thus, under the plain language of the trespass statute, the demonstrators were not in violation of the statute. The Supreme Court of South Carolina, however, construed the trespass statute as covering not only the act of entering on to the premises of another after receiving notice not to enter, but also the act of remaining on the premises after receiving notice to leave. The Supreme Court of South Carolina then applied its new interpretation of the trespass statute to the demonstrators.

The Supreme Court reversed the South Carolina Supreme Court's ruling in *Bouie* on the basis that it deprived the demonstrators of due process of law. In so doing, the Supreme Court stated that:

> The basic due process concept involved is the same as that which the Court has often applied in holding that an unforeseeable and unsupported state-court decision on a question of state procedure does not constitute an adequate ground to preclude this Court's review of a federal question. (citations omitted). ...
>
> When a state court overrules a consistent line of procedural decisions with the retroactive effect of denying a litigant a hearing in a pending case, it thereby deprives him of due process of law "in its primary sense of an opportunity to be heard and to defend [his] substantive right." (citation omitted).

378 U.S. at 354, 84 S.Ct. at 1703. The Supreme Court found that the interpretation of the trespass statute by the South Carolina Supreme Court was "clearly at variance with the statutory language," did not have "the slightest support in prior South Carolina decisions," and was contrary to prior judicial interpretations of the trespass statute. *Id.* at 356, 84 S.Ct. at 1704. Accordingly, the Supreme Court reversed the decision of the South Carolina Supreme Court because it deprived the demonstrators of their liberty without due process of law.

The Supreme Court in *Ford* and *Buder* echoed its earlier statements made in *Bouie.* In *Buder,* the Supreme Court of Missouri interpreted the term "arrest" in a manner contrary to the explicit wording of a Missouri statute. The Supreme Court reversed citing *Bouie* and stating that the unforeseeable application of a statutory term interpreted in a manner contrary to the explicit language of a statute deprived the defendant of due process. *Buder,* 412 U.S. at 432, 93 S.Ct. at 2200. Similarly, the Supreme Court in *Ford* reversed a state court ruling which procedurally barred review of a claim and stated:

> "Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, **in justified reliance upon prior decisions,** seek vindication in state courts of their federal constitutional rights." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 457–

58 [78 S.Ct. 1163, 1169–70, 2 L.Ed.2d 1488] (1958).

In *James v. Kentucky*, 466 U.S. 341 [104 S.Ct. 1830, 80 L.Ed.2d 346] (1984), we held that only "firmly established and regularly followed state practice" may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim.

498 U.S. at 423–24, 111 S.Ct. at 857–58 (emphasis added). The Court finds that the Illinois Supreme Court's application of ¶ 116–1 to Petitioner's case was not unforeseeable or insupportable and that the factual scenarios present in the Supreme Court's decisions in *Bouie*, *Buder*, and *Ford* are distinguishable from Petitioner's case.

Contrary to Petitioner's assertions, the Illinois Supreme Court's application of ¶ 116–1 to his case was not new, unforeseeable, or insupportable. The Supreme Court of Illinois in *People v. Pickett* discussed the ¶ 116–1 requirement that a defendant file a written motion for a new trial and stated:

> The general rule followed by this court is that the failure by the defendant to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a ground for reversal. (citations omitted). This waiver rule applies to constitutional questions as well as other issues.

54 Ill.2d 280, 282, 296 N.E.2d 856 (1973). At the time Petitioner's trial was completed in 1983, this waiver rule was well established and regularly applied. *People v. Lykins*, 77 Ill.2d 35, 31 Ill.Dec. 805, 807, 394 N.E.2d 1182, 1184 (1979); *People v. Precup*, 73 Ill.2d 7, 21 Ill.Dec. 863, 867, 382 N.E.2d 227, 231 (1978); *People v. Gilbert*, 68 Ill.2d 252, 12 Ill.Dec. 142, 145, 369 N.E.2d 849, 852 (1977); *People v. Lott*, 66 Ill.2d 290, 5 Ill.Dec. 841, 843, 362 N.E.2d 312, 314 (1977); *Pickett*, 54 Ill.2d 280, 282, 296 N.E.2d 856 (1973); *People v. Amerman*, 50 Ill.2d 196, 197, 279 N.E.2d 353 (1971). Indeed, the statute has been in existence since 1963. The application of ¶ 116–1 is limited by neither its own terms nor judicial interpretation. Rather, as the plain language of the statute implies and the Illinois courts have consistently held, ¶ 116–1 is a statute of general, not specialized, application. Given the consistent application of ¶ 116–1 and the lack of any limiting language in the statute or in Illinois case law, the Illinois Supreme Court's application of ¶ 116–1 to Petitioner's case cannot be said to be new or unsupported.

The Court also finds that the application of ¶ 116–1 to Petitioner's case was not unforeseeable. The Illinois Supreme Court did not interpret the language of ¶ 116–1 in a novel or clearly contrary fashion. Nor did the court construe the language of ¶ 116–1 in a manner that would overrule a consistent line of procedural decisions. Indeed, Petitioner has not cited to a single case which would even hint that ¶ 116–1 could possibly be construed as applying only to non-capital cases. The Illinois Supreme Court's application of ¶ 116–1 was not only not unforeseeable, it was foreseeable considering its general and consistent application and laudatory purpose of identifying issues for review. Indeed, Petitioner's trial attorney specifically contemplated the applicability of ¶ 116–1 to Petitioner's case, but wrongly concluded that its strictures did not apply. Accordingly, the Court finds that *Bouie*, *Ford*, and *Buder* are distinguishable from Petitioner's case and finds that the application of ¶ 116–1 to Petitioner's case was not unforeseeable or contrary to precedent. Petitioner was not, therefore, deprived of his liberty without due process of law. Accordingly, Petitioner's Ground Thirteen lacks merit and is not a proper basis upon which to grant habeas relief in this case.

## GROUND FIFTEEN

 Ground Fifteen of the Petition claims that Petitioner is actually innocent of the death penalty because his convictions for aggravated kidnapping and attempt rape, prerequisites for the death penalty in this case, are invalid.[21] In this ground, Petitioner

---

**21.** By happenstance, the issue of actual innocence of the death penalty coincides with the issue of actual innocence of the underlying offenses of aggravated kidnapping and attempt rape. In other words, Petitioner's factual innocence of these offenses at the trial phase would also constitute "actual innocence" at the sentencing phase since the aggravating factors

argues that he is actually innocent of the death penalty as a free standing constitutional claim of actual innocence, not as an exception to the procedural default rule. In lieu of any extended legal analysis, Petitioner simply refers the Court to Grounds Three, Eight, Nine, and Ten and states that for the reasons presented in these grounds, Petitioner was improperly convicted of aggravated kidnapping and attempt rape. Petitioner argues that a reversal of his convictions for aggravated kidnapping and attempt rape results in his being ineligible for the death penalty. Petitioner argues that he has established pursuant to *Sawyer* "a fair probability that a rational trier of fact would have entertained reasonable doubt as to the existence of those facts which are prerequisites under state law for the imposition of the death penalty."

Petitioner's quotation of and citation to the above standard is patently wrong and is either the result of an attempt to mislead the Court as to the proper standard or poor legal research and analysis. Since the Court is unable to state firmly that the former is true, it shall assume the latter. The issue addressed in *Sawyer* was the proper standard for determining whether a petitioner bringing a defaulted, successive, or abusive federal habeas claim has shown he is "actually innocent" of the death penalty so that a court could reach the merits of his claims. —— U.S. at ——, 112 S.Ct. at 2517. Such is not the issue in this ground. However, even if the *Sawyer* standard were the proper standard to be applied in this context, Petitioner misstates that standard. The *Sawyer* standard is whether a petitioner has shown "by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty" under the applicable state law. *Id.*, —— U.S. at ——, 112 S.Ct. at 2523. Therefore, not only has Petitioner quoted the incorrect test, he has quoted that test incorrectly.

The evidentiary standard laid out in *Herrera v. Collins* is applicable to Petitioner's claim. —— U.S. ——, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). As discussed earlier in this opinion, the Supreme Court in *Herrera*

assumed, for the sake of argument, that in a capital case a truly persuasive demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional. *Id.*, —— U.S. at ——, 113 S.Ct. at 869. The Supreme Court stated that the threshold showing for this assumed constitutional claim would be "extraordinarily high" and that relief should be granted only where a petitioner has made a "truly persuasive" demonstration of actual innocence. *Herrera*, —— U.S. at ——, ——, 113 S.Ct. at 869, 874. As previously stated by the Court, Petitioner, to be successful in his claim, must demonstrate that based upon newly discovered or newly presented evidence and the record as a whole, he is probably innocent.

Although the evidentiary standard laid out in *Herrera* is the applicable evidentiary standard for Petitioner's free standing constitutional claim of actual innocent of the death penalty, there remains the question of what exactly it means to be "actually innocent of the death penalty." Fortunately, in *Sawyer* the Supreme Court addressed this issue, albeit in the context of procedural default analysis and the miscarriage of justice exception. In *Sawyer*, the Supreme Court defined "innocent of the death penalty" as involving "a showing in addition to innocence of the capital crime itself a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met." —— U.S. at ——, 112 S.Ct. at 2522. The Supreme Court went on to state in *Sawyer* that the actual innocence showing in this context focuses upon those elements "which render a defendant eligible for the death penalty, and not on additional mitigating evidence." *Id.*, —— U.S. at ——, 112 S.Ct. at 2523. The Court finds that the *Sawyer* definition of "actual innocence of the death penalty" is applicable in the context of a free standing constitutional claim. In addition, the Court finds that such a showing should be measured by the *Herrera* evidentiary standard.

In the present case, Petitioner's showing falls far short of the required showing. Petitioner has failed to offer evidence that would demonstrate that he is actually innocent of

which make him eligible for the death penalty are these underlying convictions.

the offenses of aggravated kidnapping and attempt rape. Rather, Petitioner argues that the trial court improperly admitted evidence of dissimilar crimes, the trial court erred in failing to give a circumstantial evidence instruction, and insufficient evidence was presented to convict Petitioner of aggravated kidnapping and attempt rape. Such arguments do not go to Petitioner's actual innocence, and in any event, have previously in this Order been resolved against Petitioner. Actual innocence requires a showing through the use of newly discovered or other evidence and the entire record before the jury that convicted him that Petitioner is factually, not technically, innocent. In addition, as discussed by the Court in its analysis on pages 748–750 *supra,* sufficient evidence existed whereby a rational trier of fact could find the essential elements of aggravated kidnapping and attempt rape. Petitioner has, therefore, failed to make the extraordinarily high showing, or any other showing, required by *Herrera.* Accordingly, the Court finds that Petitioner's Ground Fifteen is without merit and is not a proper basis upon which to grant habeas relief in this case.

### CONCLUSION

IT IS THEREFORE ORDERED that Petitioner's Petition for Writ of Federal Habeas Corpus filed pursuant to 28 U.S.C. § 2254 [Doc. # 3] is **DENIED.** IT IS FURTHER ORDERED that Respondent's Motion to Reconsider the Court's Prior Ruling Allowing Petitioner to Supplement the Record [Doc. # 23] is **GRANTED in part** and **DENIED in part.** The record shall not be expanded to include the affidavits of Stanley Blackburn, Eugene Cook, James Hense, Shirley Quick, and Cheryl Stevens. This case is **TERMINATED.**